STATE of Tennessee, ex rel. W.B. LOC-
KERT, Jr., et al., Plaintiffs-Appellees,

v.

Gentry CROWELL, Secretary of State of
the State of Tennessee, et al.,
Defendants-Appellants,

and

Tennessee Voters' Council,
Defendants-Intervenors.

Supreme Court of Tennessee.

Sept. 7, 1983.

Robert L. Perry, Jr., Ashland City, Robert T. Rochelle, Lebanon, W. Henry Haile, Nashville, Olen G. Haynes, Hicks, Arnold, Haynes & Sanders, Johnson City, for plaintiffs-appellees.

Randall E. Nichols, Harwell & Nichols, Knoxville, for amicus curiae, Citizens for Fair Dist. Representation.

William M. Leech, Jr., Atty. Gen. and Reporter, Nashville, Robert B. Littleton, Sp. Deputy Atty. Gen., Nashville, Michael W. Catalano, Asst. Atty. Gen., Nashville, for defendants-appellants.

Richard H. Dinkins, Williams & Dinkins, Nashville, Jack Greenberg, James M. Nabrit, III, Napoleon B. Williams, Jr. Attys. at Law, New York City, for defendants-intervenors.

## OPINION

FONES, Chief Justice.

This is a continuation of *State ex rel. Lockert v. Crowell,* 631 S.W.2d 702 (Tenn. 1982) [Lockert I] wherein we overruled a

summary judgment holding unconstitutional the Senate Reapportionment Act, Chapter 538, Public Acts 1981 and remanded for a full evidentiary hearing because the majority of the Court believed there were disputed questions of material fact to be resolved before determining the validity of the Act.

Soon after the release of ·this Court's opinion on March 31, 1982, the General Assembly enacted Chapter 909, Public Acts 1982 wherein changes were made in the composition of Senatorial districts from those established in chapter 538, Public Acts 1981.

Plaintiffs filed a supplemental complaint on May 10, 1982, alleging that chapter 909 was also drawn in disregard of the Constitution of Tennessee and to serve the single purpose of protecting incumbents. Specifically, plaintiffs asserted that Washington, Knox, Davidson and Shelby Counties were illegally and unnecessarily divided and that the consecutive numbering provision of the State Constitution was violated in Washington and Shelby Counties.

Plaintiffs, in a separate action, attacked the constitutionality of the House Reapportionment Act, chapter 537, Public Acts 1981 on similar grounds, to-wit: that counties were unnecessarily divided and fractional parts attached to another county or counties for the sole purpose of perpetuating incumbents in office. The two cases were consolidated and tried together and the learned chancellor declared both the Senate and House Reapportionment Acts unconstitutional.

Specifically with respect to the Senate plan, the trial court held that (1) the division of Washington County was unnecessary to comply with the one person, one vote mandate and was done primarily to avoid placing two incumbents in the same Senatorial district; (2) that the proof demonstrated that thirty-three Senatorial districts that would comply with the one person, one vote mandate could be created that divided only three counties and did so only three times; (3) concluded that the Legislature, "must" enact a Senate plan that di-

vides only three counties, three times; and (4) that no evidence was presented to indicate that a Senate plan that divides only three counties three times would have any impact on minority voting strength but that a determination of that issue could not be finally made until an otherwise constitutional plan was presented.

With respect to the House plan the trial court held that (1) the division of fifty-three counties was not justified by the one person, one vote or the preservation of minority voting strength federal mandates; (2) that the drafters of the House plan admitted that no effort was made to hold county divisions to a minimum as it was assumed that the Tennessee constitutional provision was totally abrogated by the one person, one vote requirement; and (3) that the evidence revealed that the Legislature could adopt a House plan with a ten percent or less deviation from the one person, one vote optimum by dividing twenty-five counties and concluded that the Legislature "must" enact a House plan reasonably close to dividing only twenty-five counties, with the caveat that, "whenever a county is divided it must be justified by a federal constitutional mandate."

The chancellor's decree also enjoined the holding of any election, after the November 1982 General Election, under the two acts declared unconstitutional.

## I.

In spite of the fact that the law of this case was established in *Lockert I,* defendants ask that we reconsider our holding that the State's constitutional prohibition against crossing county lines must be enforced insofar as is possible and that any apportionment plan adopted must cross as few county lines as is necessary to comply with federal constitutional requirements. *Lockert I* at 715.

In support of that request, defendants present an argument which they say was "not previously advanced before this Court." In essence the argument is that Article II, Sections 5 and 6 of the Tennessee

Constitution does not really prohibit the severing of a fractional part of a multi-district county (Shelby, Davidson, Hamilton or Knox) and attachment to a contiguous county or counties to form a Senatorial district. We have given careful consideration to defendants' lengthy recitation of the historical background of the section and its application prior to the 1965 Constitutional Convention wherein the present Article II, Sections 5 and 6 were framed, proposed and adopted the following year by the electorate. Conceding that counties were divided into two categories for the first time, to-wit: multi-district counties and counties too small to form a district alone, called multi-county districts, the plain language of the sections prohibit dividing *any county* to form a multi-county district and that prohibition applies to a multi-district county as well as to a county in the multi-county category.

Next defendants cite *Logan v. O'Neill,* 187 Conn. 721, 448 A.2d 1306 (1982) and *In re: Reapportionment Plan For the Pennsylvania General Assembly,* 497 Pa. 525, 442 A.2d 661 (1981), each of which defendants interpret as submerging adherence to their respective state constitutional provisions to legislative discretion as well as federal constitutional mandates. This Court is not persuaded by those cases nor by defendants' arguments that we should sanction a single county line violation not shown to be necessary to avoid a breach of federal constitutional requirements. We adhere to the law of this case established in the opinion released on March 31, 1982.

## II.

■ Chapter 909, Public Acts 1982 divides the State into thirty-three Senatorial districts that have a total variation of 10.76% from the one person, one vote optimum population per district of 139,114. That variance was produced by district twenty-six's over population variance of 6.69% and district nineteen's under population variance of 4.07%. Chapter 909 split Washington County into two parts. The eastern part was joined with Carter and

Johnson Counties to form district one. The western part was placed in district three with Greene, Hawkins and Hancock Counties. Frank Hinton, director of the division of local government in the comptroller's office, testified that he served as principal staff person for the Senate Reapportionment Sub-committee and that he was instructed to avoid placing the two incumbents who reside in Washington County in a single district. On cross examination he testified that dividing Washington County did not diminish the total variance and that eliminating the division of Washington County would not increase the variance.

We affirm the chancellor in holding that any plan that splits Washington County is unconstitutional.

The population of Knox County in the 1980 census was 319,694. To comply with the State Constitution and divide Knox County into two districts, each would have 159,847 persons, an excess over the ideal district population of 20,773 and a deviation of plus 14.9%. The best arrangement of the approximately twenty multi-county districts will produce a negative variance of approximately 7% which with the Knox County variance would result in unacceptable total variance of 21.9%. As we noted in *Lockert I,* the Supreme Court warned in *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) that a 16.4% total deviation, even though fully justified by state policy, may well approach tolerable limits. 410 U.S. at 329, 93 S.Ct. at 987.

It follows that the State Constitution must yield and a sufficient number of the excess population over that appropriate to create two districts in Knox County must be joined with a contiguous district of one or more counties.

The chapter 909 Senate plan created districts six and seven entirely within Knox County, but put a fractional part of the county on the southwest side in district eight with Sevier and Blount Counties and a fractional part on the northwest side in district five with Anderson, Campbell and Claiborne Counties.

■ Frank Hinton testified that the committee he was working for had "the feeling that the closer we could come to perfection in the one man, one vote, the safer the plan would be." Specifically in regard to Knox County he testified that there were no political considerations whatsoever involved in putting a fractional part of Knox County in district five and another fractional part in district eight; that he did that for the sole purpose of reducing the deviation to improve compliance with the one person, one vote federal mandate. In this Court's opinion Mr. Hinton and the committee were pursuing a completely erroneous objective *not required by a proper interpretation of the United States Supreme Court cases applying the one person, one vote mandate.* Those cases have established an approximate 10% total deviation from the ideal to make a prima facie case of discrimination and absent a showing of invidious discrimination a deviation below that figure will be considered de minimis. *Brown v. Thomson,* — U.S. ——, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983); *Lockert I* at 707, *Connor v. Finch,* 431 U.S. 407, 418, 97 S.Ct. 1828, 1835–36, 52 L.Ed.2d 465 (1977); *White v. Regester,* 412 U.S. 755, 763–64, 93 S.Ct. 2332, 2337–38, 37 L.Ed.2d 314 (1973). The critical deviation range is between 10% and 16.4% where the quality and legitimacy of the state policy advanced as the reason to justify the deviation is closely scrutinized.

■ A state constitutional mandate that county boundaries be preserved in reapportioning the Legislature has been recognized by the United States Supreme Court as a legitimate, rational state policy that will *justify deviations from population equality.* In the recent case of *Brown v. Thomson, supra,* the United States Supreme Court upheld a reapportionment plan of the Wyoming House of Representatives where the state's twenty-three counties had an "average" deviation of 16% and a deviation in the state's least populous county from the ideal of −89%. It is doubtful that Tennessee, or any other state, can show the special and unique functions that counties play in the scheme of state government in Wyoming[1] and thus the unusual single deviation in *Brown* may well be inapplicable elsewhere. Nevertheless, a constitutionally backed state policy of preserving county boundaries will clearly be given high priority in the table of legitimate state policy considerations to justify variances from the ideal.

Thus it is clear that the Legislature overemphasized achieving near perfection in responding to the one person, one vote federal mandate, where it collides with the State Constitutional mandate against attaching fractional parts of counties to another county or counties to form a Senatorial district.

The population of Davidson County in the 1980 census was 477,811. Dividing Davidson County into three equal Senatorial districts would result in a population in each of 159,270 and each district would have an excess population of 20,156, a deviation of plus 14.49%. Thus Davidson County presents an almost identical situation, mathematically, to that of Knox County. The only distinction between the two counties, material to reapportionment shown in this record, is that since 1968 Davidson County has had a predominantly black Senatorial district and since the November 1968 election has been represented by a black, Senator Avon N. Williams, Jr. According to the record in this case that district, district nineteen, had a 73% black population in 1968 and in August 1982 only 63% of the district population was black. The factual conclusion that we draw from all of the proof in this record is that the Legislature recognizes the necessity of maintaining the racial integrity of Senate district nineteen consistent with its composition since 1968. Further it is clear from the direct and cross examination of Mr. Hinton that racial integrity can be maintained without detaching more than one fractional segment of Davidson County's population in excess of three districts.

Three plans drawn by Mr. Hinton and introduced as exhibits at the trial establish to a mathematical certainty that it is un-

---

1. *See Brown v. Thomson,* footnote 5, —— U.S. at ——, 103 S.Ct. at 2695.

necessary to subdivide the excess population of Knox County or Davidson County into two segments to comply with the one person, one vote requirement of federal law.

Exhibit four is perhaps the most revealing of the plans in this record. In a pre-trial order entered May 3, 1982, the chancellor directed the parties to submit three thirty-three member plans that would cross as few county lines as possible and would achieve maximum deviations of 16%, 10% and 5% respectively. Exhibit four is the plan with the 16% maximum objective, which in fact would achieve a 13.7% total deviation. In that plan only two counties, Knox and Davidson, are split and only one segment of Knox and one segment of Davidson is attached to other counties to form a district. Districts six and seven are entirely in Knox County and a single fractional part is attached to Blount and Sevier Counties to form district eight. Each of the three districts has the identical deviation of plus 5.15%, which is below the most over-populated district in the plan, district twenty-three which would have a plus 6.83% variance. Exhibit four divides Davidson County into districts eighteen, nineteen and twenty that are located entirely within Davidson County and the excess population in a single fractional part is attached to Williamson, Cheatham and Dickson Counties to form district twenty-one. Each of the four districts has the same population and the same deviation of plus 5.58%. Like Knox that deviation is below district twenty-three of plus 6.83% and is not a factor in the quality of compliance with one person, one vote.

■ We affirm the chancellor's holding that the State Constitution must yield to the one person, one vote federal constitutional requirement in reapportioning Knox and Davidson Counties, but that only one fractional segment of each county need be detached and joined with other counties to reduce the over population deviation to limits acceptable under federal law.

Shelby County has a population for reapportionment of 777,113. The exhibit four plan divides Shelby County into six districts entirely within the county and embracing the entire area and population of the county, in full compliance with the State Constitution. Each of the six districts would have a population of 129,518, a deviation of minus 6.90%. That is the largest minus deviation in the plan, the next largest being a minus 4.32% deviation in district twelve. Thus the Shelby County deviation raises the total variance of the plan by 2.58%. We are of the opinion that the exhibit 4 plan with a total variance of 13.73% would withstand all challenges on federal constitutional grounds in the federal courts. We think that opinion could be sustained on the cases prior to *Brown v. Thomson, supra,* and that the *Brown* case lends additional support, particularly in justifying the Shelby County deviation. Parenthetically, we are not overlooking the testimony of Mr. Hinton that the multi-member county districts on the exhibit 4 plan and the other plans exhibited in the record were "hypothetical" and that if and when delineated there would likely be some increase in deviation. Where the districts are carved out and described by the use of established voting precincts that would no doubt be true. But, exact or near exact population districts can be established in the urban counties and the difficulty and inconvenience thereof cannot be used to justify breaching the State or Federal Constitutions.

■ The result is that on the record before us we find no justification for detaching any segment of Shelby County to achieve a more perfect compliance with one person, one vote requirements. However, we will not foreclose the possibility that detachment of a single part of Shelby County might be justified by either (1) the necessity to reduce a variance in an adjoining district or (2) to prevent the dilution of minority voting strength.

### III.

The House Reapportionment Plan, chapter 537, Public Acts 1981, as amended in

1982,[2] crosses the county lines of fifty-seven counties and makes at least nineteen additional unnecessary and unconstitutional divisions of those counties. The plan has a total deviation of 11.07% composed of the largest minus variance of 4.93% in district sixty-eight and the largest plus variance of 6.14% in district sixty-nine.

Terry Dail was the only witness offered by defendants to uphold the constitutionality of chapter 537. Mr. Dail identified himself as a research analyst with the Office of Local Government in the Comptroller's Office. He has a degree in mathematics from Vanderbilt University. He was asked what his role was and the contacts he had in the preparation of the House plan and he answered as follows:

A. Well, I was—I guess you could say I was an advisor with the current plan. The Senate had a committee, the House did not. I began working with the members of the Democratic caucus. Upon receiving instructions from the leadership and instructions from the Attorney General's office, I began working with the individual members of the General Assembly. Each metropolitan area was drawn by someone other—they were assisted by people other than myself. And I was responsible for mainly the rural areas and the coordination over all.

He testified that he asked the Attorney General for a precise mathematical percentage to strive for and received the answer that "We would be in awfully good shape if we got less than two percent total variance." Acting under the instructions he received, a plan was prepared and enacted as Chapter 537, Public Acts 1981 and prior to the 1982 amendments had a total deviation of only 3.14%. On direct examination Mr. Dail testified that one amendment was made in 1982 that did not raise the 3.14% variance; that a second amendment was made, after this Court's decision in the Sen-

ate Reapportionment case, which, "We did not agree with ... we wanted a chance to go to court with the House plan and explain our situation ..." The second amendment "unsplit" Humphreys from a 4 way division under the 1981 Act, to a 3 way division after the amendment, and Mr. Dail emphasized that it raised the total variance to 11.07%. On cross examination, plaintiffs developed that in a no-split county plan which the witness prepared to comply with the Chancellor's pre-trial order, Humphreys, Houston, Benton and Decatur Counties were joined in a district with a plus 4.77% deviation, fully complying with both State and Federal Constitutional mandates. We are not impressed that the Humphreys County "unsplitting" contributes anything toward explaining the House reapportionment situation.

Putting aside the Humphreys County deviation, it is clear that the House plan was drafted with the objective of achieving a very low percent of total deviation and virtually no effort was made to comply with Article II, Section 5 of the Tennessee Constitution, before or after this Court's Opinion in *Lockert I.* At trial there was no serious attempt to justify the extent of the county line violations. Mr. Dail was asked if the number of splits embodied in the present plan could be justified on the constitutional grounds of compliance with one person, one vote or minority representation, and his answer was an unequivocal, "No." Later in his testimony Mr. Dail said, "We assumed that that part of the Constitution would be stricken, as being incompatible with one man, one vote."

Four hypothetical plans were prepared by Mr. Dail to comply with the Chancellor's pre-trial order of May 3, 1982. A significant revelation of the no-split county plan, Exhibit 17, was that the four urban counties present no one person, one vote problems in complying with the State mandate

---

2. Chapters 900 and 933, Public Acts 1982 amended the 1981 House plan, but involved only districts 68, 69 and 80.

against splitting a fractional part of a county and attaching it to another county or counties to form a district. Mathematically all four counties divide into self-contained districts with no population excess of more than plus 3.41% or population insufficiency greater than minus 1.52%. Shelby County is entitled to seventeen representatives, which result in a minus 1.43% deviation; Davidson ten representatives with a plus 3.03% deviation; Knox seven representatives with a 1.52% deviation and Hamilton 6 representatives with a deviation of plus 3.41%. The total deviation was 65.9%, but Mr. Dail acknowledged that he did not spend much time preparing it. In short, it was not represented to be the best no-split county plan that could be drawn.

Exhibit 18 presents other revelations. In preparing it Mr. Dail set his sights on a maximum of 16% total deviation. He began by listing the counties that would have to be divided to prevent their deviation factor from exceeding plus or minus 8%. Starting with the perfect district figure of 46,375, 8% of which is 3710, any county within the population range between 42,665 and 50,085 would not qualify for division. Suffice it to say the plan resulted in a total deviation of 13.81% from a plus 6.31% and a minus 7.50% deviation, having divided twenty-six counties. Mr. Dail's counting of more than one split per county is not clear, but approximately nine of the twenty-six counties had more than one segment split, probably unnecessarily. Nevertheless, the State Constitutional violations are substantially less than in Chapter 537 with only an increase of 2.74% deviation. The exhibit 18 plan supports the chancellor's finding that the Legislature must enact a House Plan reasonably close to dividing only twenty-five counties and that whenever a county is split it must be justified by a federal constitutional mandate. We note that the exhibit 18 plan gives Shelby seventeen districts within the county and attaches a single part of Tipton County to form district eighty-three; that Davidson County has ten districts within its borders and a single part

attached to Robertson County to form district sixty-five; and that Knox and Hamilton Counties fully comply with the State Constitution with seven and six districts, respectively, and no segment attached elsewhere.

■ Thus the Court is led to the inevitable conclusion that none of the four urban counties can be split even once unless justified by either (1) the necessity to reduce a variance in an adjoining district or (2) to prevent the dilution of minority voting strength.

Two other plans were prepared by Mr. Dail and admitted into evidence. Exhibit 19, prepared with an objective of not more than 10% total deviation resulted in a 9.30% variance by splitting thirty-three counties, some of which had more than a single segment split. Exhibit 20, prepared with an objective of not more than 5% total deviation resulted in a 3.95% variance by splitting thirty-nine counties, some of which had more than a single segment split.

■ We affirm the Chancellor's finding that the State Constitution's prohibition against dividing counties was ignored in the House reapportionment plan and that Chapter 537, as amended, is unconstitutional.

IV.

The Chancellor's bench opinion, which was incorporated into the final decree, instructed the Legislature to keep the gross maximum deviation at 10% or less. He reasoned that a deviation in the 10% to 16.4% range might withstand Constitutional challenge, if the deviations were made in a good faith effort to minimize State Constitutional violations, but that allowing a few extra percentage points, "just to keep from crossing a few more county lines to achieve a slightly smaller state constitutional violation appears, to this Court, to be . . . de minimis."

Having set the deviation maximum for both plans, the Chancellor ruled as follows

with respect to State Constitutional limits in any Senate plan:

"The Legislature can devise a Senate plan which complies with the one person, one vote requirement and divides only three counties, and does so only three times. Therefore, the Court concludes that the Legislature must enact a Senate plan which divides only three counties and does so only three times. Of course, how the Legislature does this is a matter for the Legislature and not for this Court."

It is obvious that the Chancellor was authorizing the splitting of Knox, Davidson and Shelby Counties, only, and only one time in each county. We have affirmed that holding with respect to Knox and Davidson, and modified it in the manner heretofore expressed with respect to Shelby.

The Chancellor's holding with respect to State Constitutional limits in any House plan was as follows:

"From the evidence, it appears that the Legislature can adopt a House plan with a ten percent or less maximum gross deviation from the one person, one vote optimum and divide only 25 counties. Therefore, the Court concludes that the Legislature must come reasonably close— and I say reasonably close to 25 counties because it is by no means clear that only exactly 25 counties will need to be divided. But the Court needs to make it clear that whenever a county is divided, it must be justified by a Federal Constitutional mandate."

We are of the opinion that slight modifications of the Chancellor's limitations are appropriate.

■ Our interpretation of the proof in this record is that it may be very difficult to keep the total deviation in either body below 10% and remain close to the limits of State violations set by the Chancellor, but that appropriate State limits can be attained without exceeding 14% total devia-tion for Federal equal protection requirements. If the Legislature proceeds in good faith, and puts compliance with Federal and State Constitutions above political considerations and the resulting plan has a 13.6% or 14.0% deviation, we believe it will be safe from attack, although admittedly it will not have the de minimis presumption that a 10% plan would have. The risk of having to defend a plan was alluded to by the Chancellor, in support of his 10% limit, but our view is that the suit-risk factor is a matter for Legislative discretion. The result is that we raise the 10% limit to 14% total deviation, applicable to both the Senate and the House.

■ Turning to the limitation on dividing counties in creating House districts, we think an upper limit of dividing 30 counties in the multi-county category is appropriate, with the caveat that none of the thirty can be divided more than once. In addition, with respect to the four urban counties we have left open the possibility of a small split per county only if justified by the necessity of reducing a variance in an adjoining district or to prevent the dilution of minority voting strength.

V.

Plaintiffs insist that multi-county, multi-member districts are not prohibited by the Tennessee Constitution. Plaintiffs presented a reapportionment plan utilizing such districts, but otherwise fully complying with the State Constitution, that would have a total deviation, for one person, one vote compliance of 15.26%. They advocate that the Legislature is entitled to the option of using multi-county, multi-member districts in reapportioning itself.

■ While the Constitution contains no express denunciation of two or more representatives being elected at-large in a multi-county district, permitting such districts would collide head-on with the purpose and rationale of the provision mandating that counties having two or more representa-

tives be divided into single-member districts. The 1965 Constitutional Convention mandates single-member districts for urban counties and it would be antagonistic to that decision to allow at-large elections of legislators in the multi-county districts. We think it was clearly their intent that the entire state have single-member districts and we feel compelled to hold that Article II, Section 5 of the Tennessee Constitution prohibits two or more representatives from being elected at large in a multi-county district.

While the United States Supreme Court has not held multi-member districts in apportionment plans unconstitutional per se, the Court in *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975) perhaps evinced disapproval of such districts in identifying their disadvantages to the electorate as follows:

> Notwithstanding this past acceptance of multi-member districting plans, we recognize that there are practical weaknesses inherent in such schemes. First, as the number of legislative seats within the district increases, the difficulty for the voter in making intelligent choices among candidates also increases. [citations omitted] Ballots tend to become unwieldy, confusing, and too lengthy to allow thoughtful consideration. Second, when candidates are elected at large, residents of particular areas within the districts may feel that they have no representative specially responsible to them. Third, it is possible that block voting by delegates from a multi-member district may result in undue representation of residents of these districts relative to voters in single-member districts.

The result is that the chancellor's decree finding the Senate and House Reapportionment Plans unconstitutional and enjoining the holding of any further elections under said plans is affirmed. Since both legislative bodies must be reapportioned before the 1984 elections, this cause is remanded to the Chancery Court of Davidson County for any proceedings that may be appropriately brought before that Court involving the next reapportionment plans enacted by the General Assembly. Costs are adjudged against defendants.

HARBISON and DROWOTA, JJ., and HUMPHREYS, Senior Judge, concur.

BROCK, J., concurs in part, dissents in part.

BROCK, Justice, concurring in part; dissenting in part.

I concur in the decision of the Court and in most of the majority opinion. However, I do not agree with suggestions in the opinion that in drawing legislative district lines there is any "necessity of maintaining the racial integrity of [a certain legislative district]," or that drawing a district line in a particular place may be required or justified in order "to prevent the dilution of minority voting strength."

In my view, the Constitution of the nation and that of Tennessee are color-blind. It is not constitutionally permissible to discriminate *in favor* of black people any more than it is to discriminate *against* black people. It is my opinion that in drawing legislative district lines the race, color, religion, ethnic heritage, political persuasion, economic condition, or the like, of the voters or their incumbent representatives are totally irrelevant considerations.