# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 3, 2024 Session

## GARY WYGANT, ET AL. v. BILL LEE, GOVERNOR, ET AL.

**Direct Appeal from the Chancery Court for Davidson County**
**No. 22-0287-IV**
**Russell T. Perkins, Chancellor; J. Michael Sharp, Judge; and**
**Steven W. Maroney, Chancellor**

_____

**No. M2023-01686-SC-R3-CV**

_____

In this case, two Tennessee voters challenge the state House and Senate redistricting maps the General Assembly passed after the 2020 census. Gary Wygant, a Gibson County voter, alleges that the House redistricting map violates Article II, Section 5 of the Tennessee Constitution because it splits more counties than needed to comply with federal law. Francie Hunt, a Davidson County voter, alleges that the Senate redistricting map violates Article II, Section 3 of the Tennessee Constitution because it fails to consecutively number one of the four Senate districts in Davidson County. We hold that Wygant has standing to challenge only the split of Gibson County, not the entire House map. But his challenge fails on the merits: Wygant did not prove—as he must to establish a violation of Article II, Section 5—that the split was unnecessary to comply with federal law and lacked a rational or legitimate basis. We further hold that Hunt lacks standing to challenge the Senate map because she did not suffer an injury in fact from the misnumbering of Davidson County's Senate districts. We therefore affirm the trial court's judgment rejecting Wygant's district-specific challenge on the merits, reverse the judgment concluding that Hunt has standing, and vacate the judgment holding the Senate map unconstitutional.

**Tenn. R. App. P. 3 Appeal by Right; Judgment of the Three-Judge Panel Affirmed**
**in Part, Reversed in Part, and Vacated in Part;**
**Case Remanded to the Chancery Court for Davidson County**

SARAH K. CAMPBELL, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and MARY L. WAGNER, J., joined. HOLLY KIRBY, J., filed a separate opinion concurring in part and dissenting in part. DWIGHT E. TARWATER, J., filed a separate opinion concurring in part and dissenting in part.

Scott P. Tift, David W. Garrison, and John Spragens, Nashville, Tennessee, for the appellant, Gary Wygant.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; Philip Hammersley, Assistant Solicitor General; Pablo Adrian Varela, Assistant Attorney General; Jacob R. Swatley, Memphis, Tennessee, for the appellees, Bill Lee, Governor of the State of Tennessee, Tre Hargett, Tennessee Secretary of State, and Mark Goins, Coordinator of Elections.

Scott P. Tift, David W. Garrison, and John Spragens, Nashville, Tennessee, for the appellee, Francie Hunt.

## OPINION

### I. LEGAL BACKGROUND

Each decade—after the Census Bureau releases new population data—the General Assembly is required to redraw the State's legislative maps. Tenn. Const. art. II, § 4. The redistricting process is subject to a complex web of federal and state laws that occasionally conflict.[1] As a result, the legislature must engage in a "delicate balancing of competing considerations." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017).

One of the federal requirements the legislature must satisfy is the federal Equal Protection Clause's one-person, one-vote principle. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). In *Reynolds*, the United States Supreme Court held that "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Id.* at 577. Mathematical perfection is not required, but maps that deviate from the ideal district size by more than 10% are prima facie unconstitutional. *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993) (quoting *Brown v. Thomson*, 462 U.S. 835, 842–43 (1983)). Yet there is no "safe harbor" for maps with a maximum deviation below 10%. *Cox v. Larios*, 542 U.S. 947, 949 (2004). Maps may depart from a "strict population standard" only "based on legitimate considerations incident to the effectuation of a rational state policy," such as "maintain[ing] the integrity of various political subdivisions" and "provid[ing] for compact districts of contiguous territory." *Reynolds*, 377 U.S. at 578–79.

---

[1] We use "redistricting" and "reapportionment" interchangeably throughout this opinion. *See Reapportionment*, Black's Law Dictionary (12th ed. 2024) (defining both "reapportionment" and "redistricting" as "[r]ealignment of a legislative district's boundaries to reflect changes in population and ensure proportionate representation by elected officials").

-2-

The Court acknowledged in *Reynolds* that the one-person, one-vote requirement would conflict with certain state constitutional requirements. *Id.* at 584. In the event of a conflict, the Court explained, "the [federal] Supremacy Clause of course controls." *Id.* But the Court made clear that any relief granted in apportionment cases should "accommodate . . . the apportionment provisions of state constitutions *insofar as is possible.*" *Id.* (emphasis added).

Other federal laws further constrain the redistricting process. Enacted to enforce the Fifteenth Amendment to the United States Constitution, the federal Voting Rights Act of 1965 ("VRA") prohibits States from diluting the voting strength of members of a protected class. 52 U.S.C. §§ 10301–10314; *see also, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 17–18 (2023). Voters have successfully challenged reapportionment statutes under the VRA after state legislatures eliminated or failed to create majority-minority districts. *See Allen*, 599 U.S. at 18–19; *Rural W. Tenn. Afr.-Am. Affs. Council v. Sundquist*, 209 F.3d 835, 837 (6th Cir. 2000). And while States must be conscious of race when redistricting to avoid transgressing the VRA, race may not be "the predominant factor" in drawing a district absent "a compelling reason." *Allen*, 599 U.S. at 31 (quoting *Cooper v. Harris*, 581 U.S. 285, 291 (2017)). When race is the predominant factor, States may face racial gerrymandering suits under the Equal Protection Clause. *See Cooper*, 581 U.S. at 291 ("The Equal Protection Clause . . . limits racial gerrymanders in legislative districting plans.").[2] As Justice Thomas has explained, federal redistricting precedents put States in a legally precarious situation by requiring them to "consider race *just enough* in drawing districts." *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 65–66 (2024) (Thomas, J., concurring in part).

In this case, both parties agree that the federal equal population requirement prevents strict compliance with Article II, Section 5 of the Tennessee Constitution, which prohibits the legislature from splitting counties when drawing districts for the Tennessee House of Representatives. Section 5 provides that "[i]n a district composed of two or more counties, each county shall adjoin at least one other county of such district; and no county shall be divided in forming such a district." Tenn. Const. art. II, § 5. The provision was adopted in 1966, following a limited constitutional convention. Proclamation of Frank G. Clement, Governor (Dec. 2, 1966) *in Journal and Proceedings of the Limited Constitutional Convention of Tennessee* 1066, 1068 (1966). A similar provision governs Senate districts. Tenn. Const. art. II, § 6. The Senate county-splitting provision has existed in some form since Tennessee's founding. Tenn. Const. of 1796, art. I, § 4.

---

[2] In *Louisiana v. Callais*, the United States Supreme Court will consider whether a State violates the Equal Protection Clause by intentionally creating a majority-minority district to remedy a violation of the VRA. *See* --- S. Ct. ---, No. 24-09, 2025 WL 2180226 (U.S. Aug. 1, 2025) (ordering supplemental briefing on that question).

-3-

Our Court first discussed the conflict between the federal Constitution and the state county-splitting provisions in a series of lawsuits brought by voters and county officials in the 1980s. *State ex rel. Lockert v. Crowell* (*Lockert I*), 631 S.W.2d 702 (Tenn. 1982); *State ex rel. Lockert v. Crowell* (*Lockert II*), 656 S.W.2d 836 (Tenn. 1983); *State ex rel. Lockert v. Crowell* (*Lockert III*), 729 S.W.2d 88 (Tenn. 1987). The evidence presented in the *Lockert* cases showed that it was impossible for the General Assembly to create a House plan or a Senate plan that complied with the equal population requirement and did not split any counties. *Lockert I*, 631 S.W.2d at 714; *Lockert II*, 656 S.W.2d at 842–43. In *Lockert I*, we held that "the plan adopted must cross as few county lines as is necessary to comply with the federal constitutional requirements." 631 S.W.2d at 715. In *Lockert II*, based on the evidence presented in that case, we gave the General Assembly more specific guidelines for drawing the House plan. 656 S.W.2d at 841–45. We instructed that an "upper limit of dividing [thirty] counties in the multi-county category is appropriate, with the caveat that none of the thirty can be divided more than once." *Id.* at 844.[3]

Following *Lockert II*, the General Assembly adopted the House Redistricting Guidelines. Act of May 17, 1984, ch. 778, § 1, 1984 Tenn. Pub. Acts 510, 510. Those guidelines have been adopted in every subsequent redistricting statute, including the most recent one. Act of Jan. 13, 2012, ch. 511, § 1(b), 2012 Tenn. Pub. Acts 13, 13–14; Act of Jan. 14, 2002, ch. 468, § 1(b), 2002 Tenn. Pub. Acts 1294, 1295; Act of Apr. 23, 1992, ch. 836, § 1(b), 1992 Tenn. Pub. Acts 510, 510. The current guidelines are as follows:

(b) It is the intention of the general assembly that:
> (1) Each district be represented by a single member;
> (2) Districts are substantially equal in population in accordance with constitutional requirements for "one (1) person one (1) vote" as judicially interpreted to apply to state legislative districts;
> (3) Geographic areas, boundaries, and population counts used for redistricting are based on the 2020 federal decennial census;
> (4) Districts are contiguous and contiguity by water is sufficient, and, toward that end, if any voting district or other geographical entity designated as a portion of a district is found to be noncontiguous with the larger portion of such district, it must be constituted a portion of the district smallest in population to which it is contiguous;

---

[3] As explained further below, *Lockert II* did not create a thirty-county safe harbor for county splitting. *See Rural W. Tenn. Afr.-Am. Affs. Council, Inc. v. McWherter*, 836 F. Supp. 447, 450–51 (W.D. Tenn. 1993) ("[N]owhere in the *Lockert II* opinion does the court purport to establish an absolute numerical standard, applicable in all redistricting contexts.").

(5) No more than thirty (30) counties are split to attach to other counties or parts of counties to form multi-county districts; and

(6) The redistricting plan complies with the Voting Rights Act and the fourteenth and fifteenth amendments to the United States Constitution.

Tenn. Code Ann. § 3-1-103(b) (2023).

The General Assembly must comply with other state redistricting requirements too. It is constitutionally required to create ninety-nine House districts and no more than thirty-three Senate districts. Tenn. Const. art. II, §§ 5–6. By statute, the number of Senate districts has been set at thirty-three since 1881. Act of Dec. 22, 1881, ch. 5, § 1, 1881 Tenn. Acts 1st Extraordinary Sess. 9; *see Lockert I*, 631 S.W.2d at 711 (tracking the sizes of Tennessee's House and Senate throughout Tennessee history); Tenn. Code Ann. § 3-1-101 (2023).

As relevant to Hunt's challenge, Senate districts in multi-district counties must be consecutively numbered. Tenn. Const. art. II, § 3 ("In a county having more than one senatorial district, the districts shall be numbered consecutively."). The consecutive-numbering requirement ensures that not all of a county's senators are up for election at the same time. Elections for senators—who serve four-year terms—are staggered, with elections in even-numbered districts occurring in presidential years and those in odd-numbered districts taking place in gubernatorial election years. *Id.*

## II. FACTUAL AND PROCEDURAL BACKGROUND

In February 2022, the General Assembly enacted legislation establishing the boundaries of Tennessee's state legislative districts. Act of Jan. 24, 2022, ch. 596, 2022 Tenn. Pub. Acts 65 (codified at Tenn. Code Ann. § 3-1-102 (2023)); Act of Jan. 26, 2022, ch. 598, 2022 Tenn. Pub. Acts 185 (codified at Tenn. Code Ann. § 3-1-103). Two weeks later, Tennessee voters Gary Wygant, Telise Turner, and Akilah Moore sued state officials, claiming that the House and Senate redistricting plans violated the Tennessee Constitution.[4] The voters alleged that the House plan violated Article II, Section 5's prohibition on county splitting because it split more counties than necessary to comply with the federal equal population requirement. To support this argument, the voters asserted that the House Redistricting Committee had rejected an alternative plan that would have divided seven fewer counties. The voters also alleged that the Senate plan violated Article II, Section 3's requirement that Senate districts within multi-district counties be consecutively numbered because Davidson County's four Senate districts were numbered 17, 19, 20, and 21. The voters sought a declaratory judgment under Tennessee Code

---

[4] The complaint asserted claims against Governor Bill Lee, Secretary of State Tre Hargett, and Tennessee Coordinator of Elections Mark Goins in their official capacities.

Annotated section 1-3-121, asking the court to declare both plans unconstitutional, to enjoin the use of the plans, and to order the General Assembly to redraw the maps before the August 2022 primary elections.

In March 2022, this Court entered an order designating a three-judge trial court panel to hear this case. *See* Tenn. Code Ann. § 20-18-101(a)(1)(A)(i) (2021). The Court appointed Circuit Judge J. Michael Sharp and Chancellor Steven W. Maroney to serve on the panel with Chancellor Russell T. Perkins, to whom the case was originally assigned.

Ten days later, the voters filed an amended complaint and a motion for a temporary injunction. They asked the court to enjoin the State from using the enacted legislative maps, order the State to redraw the maps within fifteen days, and delay the April 7, 2022, candidate qualifying deadline "sufficiently to allow for the Court to impose an interim redistricting plan if the legislature fails to act." The panel granted a temporary injunction with respect to the Senate plan. The State filed an application for extraordinary appeal in the Court of Appeals, and this Court assumed jurisdiction over the appeal under Tennessee Code Annotated section 16-3-201(d)(1). We granted the appeal and vacated the injunction, finding that the voters' alleged harm was outweighed by the significant harm the injunction would "have on our election officials who [would be] detrimentally impacted by the extension of the candidate filing deadline, as well as the public interest in ensuring orderly elections and avoiding voter confusion." *Moore v. Lee*, 644 S.W.3d 59, 60 (Tenn. 2022).

The voters then filed a second amended complaint requesting relief before the 2024 election. Later, they substituted voter Francie Hunt for Moore. The parties then filed competing summary judgment motions. After a hearing, the panel dismissed Turner as a party after concluding that she did not have standing to challenge either the House or Senate maps. The panel concluded that, as a resident of Gibson County, Wygant had standing to contest the House map. The panel reserved ruling on whether Hunt had standing to challenge the Senate map.

Following the panel's summary judgment rulings, the only remaining claims were Wygant's challenge to the House map and Hunt's challenge to the Senate map. The Davidson County Chancery Court held a three-day trial in April 2023. Because the State decided not to defend the Senate map on the merits, most of the evidence presented at trial concerned the House map. The evidence relating to the Senate challenge focused on Hunt's standing.

**A. House Map**

The enacted House map creates ninety-nine districts, splits thirty counties, and achieves a total population variance of 9.90%. *See* Tenn. Code Ann. § 3-1-103. The map also maintains thirteen majority-minority districts.

The timeline for the 2022 redistricting process was unusually short. Because of the COVID-19 pandemic, the federal government did not release the 2020 census data until August 2021. This meant the legislature had only five months, instead of the usual eleven, to prepare a map that could be enacted in January 2022—the start of the General Assembly's next session.

After receiving the census data, the Speaker of the House of Representatives appointed the House Select Committee on Redistricting to oversee the redistricting process. For the first time, the Committee's membership included both Republicans and Democrats.

Doug Himes, House Ethics Counsel for the Tennessee House of Representatives, was Counsel to the Committee and the primary mapmaker for the House. The General Assembly created a website in January 2021 to keep the public informed about the redistricting process, and Himes uploaded the census data to the website after it was received.

In anticipation of the Committee's first public hearing in September, Himes prepared a concept map using software called Maptitude. Himes explained that the first step in creating a concept map is to determine how many counties, based on population size, can be kept whole. To do this, he calculated the size of Tennessee's ideal House district. The census numbers showed that Tennessee's total population had grown to 6,910,840 residents. Himes then divided the total population by ninety-nine and found that Tennessee's ideal House district would contain 69,806 residents. Based on this figure, he determined that ten of Tennessee's ninety-five counties had a population either large enough to form a single whole district or capable of being dividing evenly into multiple whole districts.

Next, Himes considered where population growth and loss had occurred. The census data revealed uneven growth across the State. Although thirty counties across West Tennessee, East Tennessee, and the upper part of the Cumberland Plateau lost population, there was an "explosion" of growth around Nashville, with seventeen counties in Middle Tennessee growing by 10% or more. Based on the data, Himes concluded that three House districts would need to shift to Middle Tennessee.

Finally, Himes looked at various redistricting requirements "to see how the puzzle [would] fit." Himes testified that when preparing a map, the State considers the following criteria in order of priority: (1) the equal population requirement, (2) the VRA, (3) state constitutional provisions such as the county-splitting provisions, (4) state statutory criteria listed in Tennessee Code Annotated section 3-1-103(b), and (5) two non-statutory criteria—core preservation and minimizing incumbent pairing.

At the Committee's first meeting in September, Himes presented an overview of Tennessee's census data and explained the House Redistricting Guidelines, as codified at Tennessee Code Annotated section 3-1-103(b). He explained that the one-person, one-vote requirement made perfect compliance with the county-splitting provision in the state constitution impossible and recounted that in *Lockert II*, this Court had instructed the legislature not to split more than thirty counties.

After this presentation, the Committee adopted procedures and guidelines for proposed submissions of alternative maps from the public. Members of the public were invited to submit proposed redistricting maps between September 8 and November 12, 2021. Himes encouraged the public to submit maps, even meeting with several individuals to assist in their efforts. Ultimately, only four citizen maps were submitted. None of those maps were from Wygant. The Democratic House Caucus also submitted a map, though not until after the November 12th deadline. Himes informed the Caucus that their map had several potential legal problems, including that it reduced the number of majority-minority districts from thirteen to eight. So the Caucus submitted a new map.

In December, the Committee held a public hearing to discuss the four citizen maps, the Democratic House Caucus map, and the map that Himes prepared for the Committee. Himes discussed the legal deficiencies of each of the alternative maps. Himes acknowledged that the Democratic Caucus map created only twenty-three county splits—seven less than his proposed House map. But Himes noted that the Democratic Caucus map created a "litigation risk" because it would split Shelby County without adequate justification. In *Lockert II*, this Court held that "none of the four urban counties can be split even once unless justified by either (1) the necessity to reduce a variance in an adjoining district or (2) to prevent the dilution of minority voting strength." 656 S.W.2d at 843. Himes opined that the split of Shelby County could not be justified under these criteria. Himes also believed that the Democratic Caucus map would present a VRA litigation risk because it reduced minority voting strength. Half of the Caucus plan's thirteen majority-minority districts would be left with "bare majorities"—a significant decrease from previous maps.

The Committee next considered the map that Himes prepared. This map created ninety-nine districts, split thirty counties, and achieved a total population variance of 9.90%. A few Committee members had questions about the plan. Representative Karen Camper asked: "Why would we go to this 30-county split, if we could have did [sic] less than that?" Himes responded:

> *Lockert* gives you an upper limit of 30, and it's something that—since we had the *Lockert* decision, it's something that we placed in Tennessee code as one of our criteria. And it's consistently adopted as one of our criteria that

-8-

our limit is 30. While it is true that you can sometimes draft plans with fewer county splits, you have the discretion to get to that—to that limit, and that becomes a policy decision that you all—that you make. . . . I would suggest that if you—if you kept the plan that was presented earlier, if you kept Shelby whole, you wouldn't have 23 splits. You would have more splits. And I think what *Lockert* says, keep the urban counties whole. So 23, I think, is—is a great number. And I don't know if that is a number that you can get to but for splitting Shelby County.

At trial, Himes acknowledged that he never conveyed to the Committee this Court's instruction in *Lockert I* that the legislature should divide counties only as necessary to comply with federal constitutional requirements. He was asked: "In all three of these hearings . . . you're not aware of any point where you informed the bodies you were speaking to of an obligation to divide as few counties as necessary to comply with federal constitutional requirements; correct?" Himes responded: "I don't think it would have been in those words."

The Committee ultimately approved the map prepared by Himes and recommended the plan to the General Assembly. On January 26, 2022, the General Assembly enacted the Committee's plan into law. Act of Jan. 26, 2022, ch. 598, 2022 Tenn. Pub. Acts 185 (codified at Tenn. Code Ann. § 3-1-103).

Himes testified as an expert witness for the State. In his capacity as an expert, he reviewed the enacted House map and offered justifications for each county division. He concluded that "[e]ach split is justified by a legitimate redistricting objective such as population, the Voting Rights Act, or other criteria utilized by the Tennessee House of Representatives for state House redistricting." Himes gave justifications for each of the thirty county splits. Because we conclude that Wygant lacks standing to challenge the House map in its entirety, we focus here on the split of Gibson County and its bordering counties.

Gibson County is bordered by six other counties: Obion and Weakley to the north, Carroll to the east, Madison and Crockett to the south, and Dyer to the west. Three of those bordering counties—Carroll, Madison, and Obion—were split in the 2012 House plan and they remain split in the 2022 House plan. The only new split added to this area in 2022 was the split of Gibson County.

In his initial expert report, Himes identified "population shift" and "core preservation" as the justifications for the Gibson County split. Himes explained that "core preservation" is an attempt to maintain the core of a former legislative district to limit voter confusion and ease the burden on election officials and incumbents. But the ability to

maintain the "core" of any district changes with population shifts. The United States Supreme Court has recognized core preservation as a legitimate state policy that may justify a State's deviation from a strict population standard. *Karcher v. Daggett*, 462 U.S. 725, 740 (1983).

Himes testified that all of Gibson's neighboring counties, except for Madison County, lost population. That population loss, combined with Middle Tennessee's population growth, pushed districts to Middle Tennessee. As a result, "there ha[d] to be splits in West Tennessee." Because Gibson County's population of 50,429 is insufficient to support an entire district, Gibson had to be combined with at least one other county and one of those counties needed to be split.

Himes explained that it was not a viable option to keep Gibson whole by simply attaching it to part of the more populous Madison County. Because Madison County's current districts were formed in response to federal VRA litigation, *see Rural W. Tenn. Afr.-Am. Affs. Council*, 209 F.3d at 837, 839, 844, adjusting them would risk VRA noncompliance.

Elaborating on the "core preservation" justification, Himes testified that the new District 79 retained the core of old District 79. He explained that "[i]t maintains the larger part of Gibson" and the "same part of Carroll." He noted that the map "draws [the split] on Highway 45 West" and "tries to keep the municipalities all in District 79," with "[o]nly Humboldt [being] split in Gibson County."

The other half of Gibson County became part of District 82. The new District 82 keeps Lauderdale and Crockett counties whole and adds parts of Gibson and Obion counties. Himes testified that "Gibson is a bridge to make sure that enough population could be in the districts." He added that "Obion helps District 82 with its population variance."

It was Himes's expert opinion that the General Assembly made an honest and good-faith effort when enacting the House plan. He observed that each mapmaking decision creates a domino effect. Given the myriad requirements a map must fulfill, an infinite number of potential solutions exist. Himes opined that a map should not be deemed unconstitutional simply because it is theoretically possible to draw a map that divides fewer counties. In his view, there can be multiple constitutional plans, with differences in overall deviation from the population ideal and the number of counties divided. He was doubtful that a "perfect map" could ever be achieved.

Dr. Jonathan Cervas testified as an expert witness for Wygant. Cervas has a Ph.D. in political science from the University of California, Irvine, and has assisted several courts in redistricting and voting rights cases. During this litigation, Cervas produced a series of

illustrative maps. His goal was to produce a constitutional map that split fewer counties than the enacted House map.

Cervas's maps were reviewed and critiqued by Himes and the State's other expert, Sean Trende, a Ph.D. candidate at The Ohio State University and an analyst for RealClearPolitics.com. Himes and Trende identified several problems with the maps, including contiguity issues, increased risk of VRA litigation, double splitting of counties in violation of Article II, Section 5 of the Tennessee Constitution, and increased risk of equal protection litigation. Cervas altered his maps in response to these critiques. Nearly a year into litigation, he produced a map—Map 13d_e—that Himes agreed would be constitutional if a minor contiguity problem were corrected.

Map 13d_e splits twenty-four counties (six fewer than the enacted House map) and achieves a population variance of 9.89% (.01% less than the enacted House map). The map does not divide Gibson County. The map contains the same thirteen majority-minority districts as the enacted House map, pairs the same number of incumbents, and retains the same percentage of old district cores. The parties agreed that Map 13d_e has a contiguity problem that could be corrected without affecting the overall population variance.

Cervas acknowledged that there are "lots of tradeoffs in redistricting" and admitted that "there are no perfect plans." He testified that out of all the maps he produced for this litigation, there is no "best" map because "[b]est is not a quantity that can be defined in redistricting." In Cervas's opinion, however, "[i]t's unequivocal that the legislature can create a 99-district plan that splits fewer than 30 counties, including plans that have substantially fewer county splits than 30."

Gary Wygant has resided in Gibson County since 2015. Wygant testified that he votes in every election and plans to continue doing so. He is the chairman of the Gibson County Democratic Party.

Wygant resides in House District 79. The new House map did not change Wygant's district number, but it did change his district's boundaries. House District 79 previously included all of Gibson County plus part of Carroll County. The new House map splits Gibson County from north to south and creates two House districts. The first—House District 79—contains the eastern part of Gibson County, the southern part of Carroll County, and the northern part of Henderson County. The second—House District 82—contains the western part of Gibson County, a southern part of Obion County, and all of Crockett and Lauderdale Counties.

Under the former map, Wygant's district was represented by a Gibson County resident—Representative Curtis Halford.[5] Now, after the 2022 election, neither House District 79 nor House District 82 is represented by a Gibson County resident. According to Wygant, this was "a big change" for Gibson County. He conceded, however, that the former House map did not guarantee that Gibson County would be represented by a Gibson County resident, because the district included part of Carroll County.

Wygant testified that, after redistricting, Gibson County's "representation is fractured from an east/west perspective." Because of this fracture, voters are unsure whom they should call when an issue arises in Gibson County. He stated: "So, if we've got an issue that pertains to Gibson County, who do we call? We've got to call both and say, 'Hey, we have an issue we need to address . . . .'"

Wygant wished that the redistricting process had been more transparent. But he acknowledged that he never investigated ways to provide input on the process. He was unaware of the General Assembly's public hearings on redistricting and did not know there had been an opportunity to submit maps to the General Assembly.

Wygant understood that Gibson County, with a population of about 50,000, was too small to get its own House district. He also acknowledged that the State could not simply combine Gibson and Carroll counties without splitting one of them because together their population was too large to form a single House district. When asked if he knew whether any alternative plans provided to the General Assembly during the redistricting process kept Gibson County whole, he said that he did not.

Wygant testified that the split of Gibson County was "foremost in [his] mind" and the only one of the thirty county splits that he had "experience[d]." When asked if he had been personally or individually impacted by the other county splits, he said: "Well, I do hear about it from the other county chairmen, yes. But that's really them relaying their feelings." He testified that his opinion about county splits was "now inclusive of the counties that have been attached to the county that [he] represent[s] as chairman of the democratic party" because he "ha[s] to pay attention in some way to what's happening there in order to work with legislators with regard to what's happening in Gibson County and what could happen in Gibson County."

---

[5] Representative Halford retired and did not run for reelection in 2022.

## B. Senate Map

The challenged Senate map creates four nonconsecutively numbered senatorial districts in Davidson County, *see* Tenn. Code Ann. § 3-1-102(d)(17), (19)–(21), even though Article II, Section 3 of the Tennessee Constitution requires that "[i]n a county having more than one senatorial district, the districts shall be numbered consecutively," Tenn. Const. art. II, § 3. The Davidson County senatorial districts are numbered 17, 19, 20, and 21.

Francie Hunt has resided in Davidson County since 1999. Hunt testified that she votes in every election and plans to continue doing so. She is the executive director of Tennessee Advocates for Planned Parenthood.

Hunt resides in the new Senate District 17. Under the former Senate map, she resided in Senate District 18. The previous map consecutively numbered Davidson County's four senatorial districts. As a result, two Davidson County senators were up for election in presidential election years and two were up for election in gubernatorial election years. Now, because Davidson County's four senatorial seats are nonconsecutively numbered, three senators—including Hunt's senator—are up for election in gubernatorial election years while only one is up for election in presidential election years.

Hunt testified that she is a registered Democrat who disagrees with "what the governor and the State of Tennessee has done." She expressed her displeasure that there is a "Republican supermajority at the state level." She testified that she brought this suit to ensure that "the word of the Constitution was being followed to the letter."

Hunt agreed that "the benefit of consecutive numbering within Davidson County, if there is any, is that at any one election, only two Davidson County senate seats can turn over." In the 2022 election, three of Davidson County's four senate seats, including the seat in Hunt's district, were up for election. Hunt acknowledged, however, that only one of those three seats turned over.

This is not the first time Davidson County's senatorial districts have been nonconsecutively numbered. The plans enacted following the 1990 and 2000 census both created nonconsecutively numbered districts in Davidson County. Hunt lived in Davidson County when both those maps were in place, but she was unaware of the numbering issue at that time.

The State did not offer testimony regarding the merits of the Senate plan. Cervas testified that, in his opinion, there is "no justification" for Davidson's districts to be nonconsecutively numbered. Cervas presented three alternative maps that would correct the numbering of districts in Davidson County. His proposed plans showed that the enacted

-13-

Senate map could be minimally altered by swapping the numbers of two even-numbered districts and swapping the numbers of two odd-numbered districts. These swaps would ensure that no incumbent senator's term would be cut short.

## C. Trial Court Opinion

In November 2023, the three-judge panel issued a divided opinion holding that: (1) Wygant had standing to bring a district-specific challenge to the House plan; (2) the House plan was constitutional; (3) Hunt had standing to challenge the Senate plan; and (4) the Senate plan was unconstitutional.[6] The panel dismissed Wygant's challenge to the House plan with prejudice. The panel entered judgment for Hunt as to the Senate plan and, under Tennessee Code Annotated section 28-18-105(a), ordered the General Assembly to adopt a constitutionally compliant Senate plan by January 31, 2024.

As for Wygant's standing, the panel majority held that Wygant had standing to bring a district-specific challenge but not a statewide challenge. The panel reasoned that the only individualized harm Wygant suffered flowed from the Gibson County split. Wygant testified that he was injured by the split because his county was now represented by two different representatives, neither of whom resides in Gibson County. When asked whether he had been personally injured by the splits of other counties, Wygant said that he had heard complaints from other county chairmen. The panel explained that "[s]econd hand relation of complaints from residents of other counties does not constitute individualized harm to Wygant."

Turning to the merits of Wygant's challenge, the panel majority noted that this Court's decisions in *Lockert I* and *Lincoln County v. Crowell*, 701 S.W.2d 602 (Tenn. 1985), appeared to impose different burdens of proof. *Lockert I* required the State to prove that it had created the map containing the split in good faith, while *Lincoln County* required the challenger to prove that the State had acted in bad faith or with an improper motive. The panel found that the law was unsettled and decided to apply both standards. And it concluded that the House plan was constitutional under either standard.

First, the panel majority concluded that the State had met its burden under *Lockert I* by proving that it had acted in good faith when creating the Gibson County split. The Court credited Himes's expert testimony regarding the justifications for the Gibson County split, finding that the split was justified by both federal equal protection and VRA concerns. The Committee's public outreach and request for the submission of alternative maps provided further evidence of good faith. The lengths to which Wygant's expert mapmaker

---

[6] Chancellor Maroney and Judge Sharp constituted the majority as to the ruling on the constitutionality of the House plan. Chancellor Perkins and Judge Sharp constituted the majority as to the ruling on Hunt's standing.

had to go to produce one constitutional map, after many months of effort, also supported a finding of good faith. Finally, the panel credited Himes's expert opinion that the House plan "represent[ed] an honest and good faith effort by the General Assembly to adopt a constitutionally compliant map."

Next, the panel majority concluded that Wygant had failed to meet his burden under *Lincoln County* because neither Wygant nor Cervas testified that the General Assembly acted in bad faith or with improper motive.

Chancellor Perkins dissented as to the constitutionality of the House plan. In the dissent's view, the burden was on the State to prove that the House plan crossed as few county lines as necessary to comply with federal constitutional requirements. The State, the dissent argued, had failed to meet this burden because "the legislature treated the thirty-county split as a safe harbor."

As for Hunt's standing, the panel majority concluded that Hunt had asserted a distinct and palpable injury that could be redressed by the enactment of a constitutional Senate plan. The panel found that "the Senate map has infringed upon Ms. Hunt's constitutional right to vote in a senatorial district consecutively numbered with the other senatorial districts in her county of residence." Hunt's injury was individualized, the panel reasoned, because it caused Hunt to be "treated differently from a larger group of voters in populous counties in Tennessee." The panel concluded that "[t]he General Assembly has the power to swap the numbers of two Senators' districts during the term of office without affecting their abilities to serve their full terms" and ordered the General Assembly to do so.

Chancellor Maroney dissented as to Hunt's standing. He disagreed with the majority's assertion that Hunt's right to vote had been diluted. In Chancellor Maroney's view, Hunt had articulated only a generalized injury—that the nonconsecutive numbering of Davidson County's Senate seats increased the possibility of turnover in the delegation.

Wygant and the State appealed to this Court as of right. *See* Tenn. Code Ann. § 20-18-105(c) (2021). Wygant appealed the panel's judgment that he lacked standing to challenge the statewide House map and that he failed to prove the unconstitutionality of the Gibson County split. The State appealed the panel's judgment on Hunt's standing. Both Wygant and Hunt moved to expedite the appeals. The State also sought to stay the panel's judgment to the extent it held the Senate plan unconstitutional and ordered the General Assembly to adopt a new Senate plan. This Court denied both motions to expedite and granted the State's stay motion.

-15-

## III. STANDARD OF REVIEW

We review questions of law de novo, without giving the trial court's legal conclusions any presumption of correctness. *E.g.*, *Lynch v. City of Jellico*, 205 S.W.3d 384, 390 (Tenn. 2006) (constitutionality of a state statute); *see also City of Memphis v. Hargett*, 414 S.W.3d 88, 96 (Tenn. 2013) (standing); *Bredesen v. Tenn. Jud. Selection Comm'n*, 214 S.W.3d 419, 435 (Tenn. 2007) (political question). When a case is tried by a judge instead of a jury, we presume the trial court's factual findings are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *King v. Anderson Cnty.*, 419 S.W.3d 232, 245 (Tenn. 2013).

We presume that statutes enacted by the legislature are constitutional and "indulge every presumption and resolve every doubt in favor of constitutionality." *Lynch*, 205 S.W.3d at 390 (quoting *Vogel v. Wells Fargo Guard Servs.*, 937 S.W.2d 856, 858 (Tenn. 1996)).

## IV. ANALYSIS

We begin our analysis by considering whether the claims here are justiciable. We first consider whether Wygant's claim presents a nonjusticiable political question. We then consider whether Wygant and Hunt have standing to bring their respective challenges. Finally, having concluded that only Wygant's district-specific challenge to the House plan is justiciable, we address the merits of that claim and hold that Wygant has failed to establish a violation of Article II, Section 5 of the Tennessee Constitution.

### A. Justiciability

Tennessee's justiciability doctrines are by now well known. They include ripeness, standing, mootness, the prohibition against advisory opinions, the political question doctrine, and the requirement that plaintiffs exhaust administrative remedies. *Case v. Wilmington Tr., N.A.*, 703 S.W.3d 274, 281 n.5 (Tenn. 2024); *see also Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 203 (Tenn. 2009). Justiciability doctrines "guide courts in determining whether to hear and decide a particular case." *Wilmington Tr.*, 703 S.W.3d at 281 (citing *Norma Faye*, 301 S.W.3d at 203). Although the doctrines are not included in the text of the Tennessee Constitution, they are rooted in our dual separation of powers provisions. *Wilmington Tr.*, 703 S.W.3d at 281; *Norma Faye*, 301 S.W.3d at 202–03; *see also* Tenn. Const. art. II, §§ 1–2. The first of those provisions—Article II, Section 1—provides that "[t]he powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial." Tenn. Const. art. II, § 1. The second—Article II, Section 2—instructs that "[n]o person or persons

belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." *Id.* art. II, § 2.

Our justiciability doctrines safeguard the separation of powers by ensuring that the judiciary exercises the judicial power, not powers belonging to the legislative or executive branches. *See Norma Faye*, 301 S.W.3d at 202–03 (explaining that Tennessee's justiciability doctrines "are based on the judiciary's understanding of the intrinsic role of judicial power" and "respect for the separation of powers doctrine"). Two justiciability doctrines are at issue here: the political question doctrine and standing. Our review is de novo as to both doctrines because justiciability is a question of law. *See Rainwaters v. Tenn. Wildlife Res. Agency*, No. W2022-00514-COA-R3-CV, 2024 WL 2078231, *4 (Tenn. Ct. App. May 9, 2024).

*1. Political Question Doctrine*

The State contends that whether the House reapportionment statute impermissibly splits counties in violation of Article II, Section 5 is a nonjusticiable political question.

In "rare cases," our political question doctrine "precludes consideration of the particular issue or claim raised by the party." *Bredesen*, 214 S.W.3d at 434. To determine if an issue is a "political question," Tennessee courts rely on factors borrowed from the United States Supreme Court's political question precedents. *Id.* at 435–36 (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962)). We consider whether the case involves "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Mayhew v. Wilder*, 46 S.W.3d 760, 773 (Tenn. Ct. App. 2001) (quoting *Baker*, 369 U.S. at 217); *see Bredesen*, 214 S.W.3d at 435 (quoting *Mayhew*, 46 S.W.3d at 773). These two factors are "not completely separate," as "the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Nixon v. United States*, 506 U.S. 224, 228–29 (1993); *see Bredesen*, 214 S.W.3d at 436.

The State previously argued, in *Lockert I*, that a county-splitting challenge to a reapportionment statute presented a nonjusticiable political question. 631 S.W.2d at 705. This was so, the State claimed, because reapportionment is a legislative function and courts were unable to "grant the ultimate remedy of formulating their own reapportionment plan." *Id.* We rejected this argument. *Id.* at 706. Although we acknowledged that "apportionment is primarily a legislative function," we held that if the legislature "fails to act constitutionally after having had a reasonable opportunity to do so," a court may "devise its own constitutional plan." *Id.*

Recently, Tennessee adopted a statute requiring courts to give the General Assembly at least fifteen days to enact a new apportionment plan if the current plan is held unconstitutional. Tenn. Code Ann. § 20-18-105(a) (2021). If the General Assembly fails to act in the allotted time, "then the court may impose an interim districting plan for use only in the next election cycle." *Id.* § 20-18-105(b).

The State raises a different political question argument here. The State asserts that the third sentence of Article II, Section 4 of the Tennessee Constitution "commits to the General Assembly the authority to choose whether and to what extent it will elevate county-line preservation over other redistricting criteria." According to the State, this text "expressly authorizes the General Assembly in its discretion to subordinate the county-splitting provision to 'other [redistricting] criteria.'"

Section 4 of Article II provides in full as follows:

The apportionment of Senators and Representatives shall be substantially according to population. After each decennial census made by the Bureau of Census of the United States is available the General Assembly shall establish senatorial and representative districts. *Nothing in this Section nor in this Article II shall deny to the General Assembly the right at any time to apportion one House of the General Assembly using geography, political subdivisions, substantially equal population and other criteria as factors; provided such apportionment when effective shall comply with the Constitution of the United States as then amended or authoritatively interpreted.* If the Constitution of the United States shall require that Legislative apportionment not based entirely on population be approved by vote of the electorate, the General Assembly shall provide for such vote in the apportionment act.

Tenn. Const. art. II, § 4 (emphasis added). Article II, Section 4 was ratified in 1966. Proclamation of Frank G. Clement, Governor (Dec. 2, 1966) *in Journal and Proceedings of the Limited Constitutional Convention of Tennessee* 1066, 1067 (1966). This Court has never considered the meaning of the third sentence of this section.

Our task when interpreting a provision of the Tennessee Constitution is to determine its "original public meaning." *McNabb v. Harrison*, 710 S.W.3d 653, 658 (Tenn. 2025); *see also State ex rel. Doyle v. Torrence*, 310 S.W.2d 425, 427–28 (Tenn. 1958). That is, we ask "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *McNabb*, 710 S.W.3d at 658 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012)). To answer that question, we may consult dictionaries, apply well-established canons of construction,

and employ other traditional tools of interpretation to discern how the public would have understood the text. *Id.*; *see also State v. Deberry*, 651 S.W.3d 918, 924–25 (Tenn. 2022); *Kisor v. Wilkie*, 588 U.S. 558, 621–22 (2019) (Gorsuch, J., concurring in judgment). Because constitutional interpretation should not occur in a vacuum, we also consider the historical context in which the provision was adopted. *See McNabb*, 710 S.W.3d at 658, 661; *Smith v. BlueCross BlueShield of Tenn.*, 710 S.W.3d 686, 694 (Tenn. 2025). Moreover, we "construe the Tennessee Constitution as a single, unified document," taking care not to interpret any provision in a way that would "impair or destroy any other part." *McNabb*, 710 S.W.3d at 659 (quoting *Vollmer v. City of Memphis*, 792 S.W.2d 446, 448 (Tenn. 1990)).

The third sentence of Section 4 has two clauses. The first clause provides that "[n]othing in this Section nor in this Article II shall deny to the General Assembly the right at any time to apportion one House of the General Assembly using geography, political subdivisions, substantially equal population and other criteria as factors." Tenn. Const. art. II, § 4. The word "deny," in the sense used here, means "to refuse to grant" or "withhold." *Deny*, The American Heritage Dictionary of the English Language 353 (1973); *see also Deny*, Ballentine's Law Dictionary 334–35 (3d ed. 1969) ("To deny means to withhold, to refuse to grant."). The meaning of the first clause is straightforward: it makes clear that neither Section 4 nor Article II withholds from the General Assembly "the right at any time to apportion one House of the General Assembly using geography, political subdivisions, substantially equal population and other criteria as factors." Tenn. Const. art. II, § 4.

The second clause of Section 4 is a proviso that conditions the first clause. *See* Scalia & Garner, *supra*, at 154. The General Assembly may apportion according to the first clause "provided such apportionment when effective shall comply with the Constitution of the United States as then amended or authoritatively interpreted." Tenn. Const. art. II, § 4. Taken together, the two clauses mean that nothing in Section 4 or Article II withholds from the General Assembly the right to apportion one house of the General Assembly using the listed factors, so long as the apportionment complies with the federal Constitution.

Contrary to the State's argument, this language does not grant the General Assembly discretion to ignore or subordinate Section 5's prohibition on county splitting. Although the phrase "[n]othing in this Section nor in this Article II shall deny" is properly understood as superordinating language, this language "merely shows which provision prevails in the event of a clash" and "does not necessarily denote a clash of provisions." Scalia & Garner, *supra*, at 126.

Here, Section 4 and the county-splitting prohibition in Section 5 do not clash. Section 4 preserves the General Assembly's authority to consider a range of factors including "political subdivisions" when apportioning one house of the legislature, while

Section 5 mandates that "no county shall be divided" in the forming of multi-county districts for representatives. Tenn. Const. art. II, §§ 4–5. Section 5 does not deny or withhold from the General Assembly the right to apportion based on the listed factors. Quite the opposite: it requires the General Assembly to apportion based on "political subdivisions" by mandating that counties be kept intact. *See* Tenn. Const. art. II, § 5. Because Section 4 and Section 5 do not clash, we will not construe the former to "impair or destroy" the latter. *McNabb*, 710 S.W.3d at 659. We therefore reject the State's assertion that Section 4 grants the General Assembly discretion to ignore Section 5's county-splitting prohibition.

The historical context in which Section 4 was adopted further supports our reading. Tennessee voters approved the current version of Section 4,[7] as well as the county-splitting prohibition in Section 5, in the election of 1966. Proclamation of Frank G. Clement, Governor (Dec. 2, 1966) *in Journal and Proceedings of the Limited Constitutional Convention of Tennessee* 1066, 1067–68 (1966). That was two years after the United States Supreme Court held in *Reynolds v. Sims* that both houses of a bicameral state legislature must be apportioned based "substantially on population." 377 U.S. at 578.

Before *Reynolds*, courts understood the federal Equal Protection Clause to require only one house of a bicameral legislature to be apportioned "based, fully and in good faith, on numbers of qualified voters without regard to any other factor." *Baker v. Carr*, 206 F. Supp. 341, 349 (M.D. Tenn. 1962); *see Baker v. Carr*, 222 F. Supp. 684, 687 (M.D. Tenn. 1963) (citing numerous cases from other jurisdictions). Apportionment of the other house could "take into account other interests and objectives" including "the policy of providing adequate legislative representation to the rural population whose special interests might otherwise be overridden by 'sheer weight of numbers.'" *Baker*, 222 F. Supp. at 687. *Reynolds* was thus viewed as a significant restriction of state apportionment power. *See, e.g.*, Clayton Knowles, *Redistricting Will Have Wide Impact on Most States*, N.Y. Times, June 21, 1964, at E3 ("Nothing in many years has quite shaken up state government like last week's Supreme Court decree that districts of both houses of state legislatures must be 'substantially equal.'").

In the wake of *Reynolds*, efforts were made to amend the United States Constitution to restore power to the States. Senator Everett Dirksen of Illinois introduced a constitutional amendment that would grant the States the right to "apportion one house of a bicameral legislature using population, geography, or political subdivisions as

_____

[7] The previous version of Section 4 read: "An enumeration of the qualified voters, and an apportionment of the Representatives in the General Assembly, shall be made in the year one thousand eight hundred and seventy-one, and within every subsequent term of ten years." Tenn. Const. of 1870, art. II, § 4.

factors . . . if . . . such plan of apportionment has been submitted to a vote of the people . . . ." 111 Cong. Rec. 18856 (1965). The final two sentences of Article II, Section 4 of the Tennessee Constitution contain language strikingly similar to that of the proposed Dirksen amendment. *See* Tenn. Const. art. II, § 4. Indeed, the final sentence of Section 4 instructs the General Assembly to provide for a vote of the electorate on apportionment acts if the Constitution should require such a vote. *Id.*

Records from the Limited Constitutional Convention of 1965 confirm that Section 4 was drafted in response to the proposed Dirksen amendment.[8] The Chairman of the Apportionment Committee, Allen J. Strawbridge, told the Convention that Section 4 was designed as a means of allowing the legislature "a chance to take advantage" of the Dirksen amendment. Debates of December 1, 1965, Ltd. Const. Convention of 1965 (Dec. 1, 1965) *in Journal and Proceedings of the Limited Constitutional Convention of Tennessee* 850, 863 (1966). And Delegate Charles Hill Anderson, a member of the Apportionment Committee, described the third sentence of Section 4 as "an accommodation in the event the so-called 'Dirksen Amendment' is adopted." *Id.* at 868.

This historical context lends no support to the State's proposed reading of Section 4. Section 4 was adopted to permit the General Assembly to take advantage of any eventual expansion of state apportionment power by preserving the General Assembly's authority to reapportion one house of the legislature according to factors other than population. But this preservation of the General Assembly's authority did not destroy Section 5's more detailed directive requiring that counties be kept intact. We therefore reject the State's argument that Section 4 gives the legislature unfettered discretion to ignore or subordinate Section 5's prohibition on county splitting.

The State also argues that there is "no judicially manageable standard . . . for courts to decide whether a county split violates the Tennessee Constitution." We disagree on that score as well. To be sure, the clear standard provided in Article II, Section 5—that "no county shall be divided in forming a [multi-county] district"—cannot be strictly applied given the General Assembly's obligation to comply with the federal one-person, one-vote principle and other federal requirements. *See Lockert I*, 631 S.W.2d at 715. But that does not mean that a judicially manageable standard is altogether lacking. Tennessee's courts adjudicated county-splitting challenges in the *Lockert* cases and *Lincoln County*. To the extent those cases created uncertainty about the applicable legal standard, we address that conflict below by clarifying the standard.

---

[8] We consider the convention records because they are part of the historical context of the relevant language in Article II, Section 4, not because we view the statements of individual delegates as dispositive evidence of that language's meaning. *See, e.g.*, *Perez v. City of S.A.*, 715 S.W.3d 709, 716 & n.8 (Tex. 2025); *Barnett v. Jones*, 338 So. 3d 757, 766–67 (Ala. 2021) (Mitchell, J., concurring specially).

It bears repeating that only in a "rare case[]" will we find that "the doctrine of separation of powers precludes consideration of the particular issue or claim raised by the party." *Bredesen*, 214 S.W.3d at 434. And this case is easily distinguishable from that narrow category of cases. For example, compare this case with *Bredesen v. Tennessee Judicial Selection Commission*. *Bredesen* involved an equal protection challenge to the Governor's decision to reject a panel of judicial nominees at least partly because none were minority candidates. *Id.* at 428, 432. This Court held that this challenge presented a nonjusticiable political question. *Id.* at 436. We found that Article VII, Section 4 of the Tennessee Constitution textually commits the power of filling judicial vacancies to the legislature. *Id.* at 435. That provision instructs that "the filling of all vacancies not otherwise directed or provided by this Constitution, shall be made in such manner as the Legislature shall direct." Tenn. Const. art. VII, § 4. By statute, the legislature had empowered the Governor alone to make appointments to fill judicial vacancies. *Bredesen*, 214 S.W.3d at 435. We thus concluded that there was a "lack of judicially discoverable and manageable standards for resolving [the issue]." *Id.* at 436.

Here, by contrast, there is no textual commitment of apportionment decisions to the legislative or executive branches. And there is a judicially manageable standard for determining whether the State has violated the county-splitting provision, to the extent it has not been preempted by federal constitutional and statutory requirements. If the court finds that the provision has been violated, moreover, it can remedy that violation by allowing the legislature to redraw the map or, failing that, providing an interim map. *See* Tenn. Code Ann. § 20-18-105(a)–(b) (2021). We therefore conclude that Wygant's challenge to the House map does not present a nonjusticiable political question.[9]

## *2. Standing*

Standing is a threshold inquiry that determines "whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *City of Memphis*, 414 S.W.3d at 97 (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)); *see also Wilmington Tr.*, 703 S.W.3d at 281; *ACLU of Tenn. v. Darnell*, 195 S.W.3d 612, 619 (Tenn. 2006). Until recently, Tennessee's constitutional standing doctrine "was adopted wholesale" from federal judicial precedents and required all plaintiffs to satisfy a three-element test to establish standing. *Wilmington Tr.*, 703 S.W.3d at 282. Under that test, a plaintiff must show (1) that he suffered an injury in fact; (2) that the injury is fairly traceable to the

---

[9] The State does not argue that Hunt's challenge to the Senate map presents a nonjusticiable political question. This Court has never squarely considered whether the political question doctrine is jurisdictional in nature and therefore not subject to waiver. Because we conclude that Hunt lacks standing to bring her challenge, we have no occasion to consider that question in this case.

challenged conduct; and (3) that a favorable judicial decision would redress the injury. *See City of Memphis*, 414 S.W.3d at 98.

In *Wilmington Trust*, however, we reconsidered our standing doctrine in light of the specific requirements of the Tennessee Constitution. 703 S.W.3d at 282–92. We explained that the federal standing doctrine is grounded in Article III of the United States Constitution—namely, the language in Section 2 limiting the exercise of the federal judicial power to "[c]ases" or "[c]ontroversies." *Id.*; *see also* U.S. Const. art. III, § 2; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). But the Tennessee Constitution lacks a similar limitation, so federal standing precedents are of limited relevance to justiciability in Tennessee's courts. *See Wilmington Tr.*, 703 S.W.3d at 286.

Tennessee's standing inquiry must instead be guided by the relevant provisions of the Tennessee Constitution: the Open Courts Provision in Article I, Section 17, and the Separation of Powers Provisions in Article II, Sections 1 and 2. *Id.* The Open Courts Provision states in relevant part "[t]hat all courts shall be open; and every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law." Tenn. Const. art. I, § 17. In *Wilmington Trust*, we interpreted this provision to mean that "a person asserting an injury to their land, goods, person, or reputation—i.e., private rights claims" must "allege an injury in law in order to have standing in court" but need not show an injury in fact. 703 S.W.3d at 288.

Tennessee's separation of powers provisions require the judicial branch to exercise only judicial power and prohibit it from usurping authority that belongs to the legislative and executive branches. *See* Tenn. Const. art. II, §§ 1–2. Claims involving public rights— those that are "common to all[] and incident to citizenship itself"—present a significant risk that the judiciary will overstep the bounds of its authority and intrude on legislative and executive prerogatives. *Wilmington Tr.*, 703 S.W.3d at 289 (quoting *Patten v. City of Chattanooga*, 65 S.W. 414, 420 (Tenn. 1901)). That's because the protection of public rights is generally entrusted to public officials, not private citizens. *Id.* at 289–91; *see also Patten*, 65 S.W. at 419–20. Accordingly, to safeguard the separation of powers, we have long required plaintiffs asserting public rights claims to show a special injury. *Wilmington Tr.*, 703 S.W.3d at 289–91; *see also, e.g., Darnell*, 195 S.W.3d at 626; *Skelton v. Barnett*, 227 S.W.2d 774, 775–76 (Tenn. 1950); *Schultz v. Lewallen*, 217 S.W.2d 944, 945 (Tenn. 1948); *Buena Vista Special Sch. Dist. v. Bd. of Election Comm'rs of Carroll Cnty.*, 116 S.W.2d 1008, 1009 (Tenn. 1938); *Patten*, 65 S.W. at 419. We thus confirmed in *Wilmington Trust* that plaintiffs asserting public rights claims still must satisfy the three-element standing test that we borrowed from federal precedent. *Wilmington Tr.*, 703 S.W.3d at 291.

Because *Wilmington Trust* "clearly concern[ed] only private rights," we did not attempt to more precisely define public rights or private rights or to articulate a test for distinguishing between the two categories of claims. *Id.* at 291 n.16.[10] We need not attempt that here either because, whatever the exact contours of the public rights category, the claims asserted by Wygant and Hunt easily fit within it.

Wygant alleges that the House map violates Article II, Section 5 of the Tennessee Constitution by impermissibly splitting counties. The right that he asserts is the right to have a House map drawn in compliance with Article II, Section 5. That right is "common to all" Tennessee citizens. *Wilmington Tr.*, 703 S.W.3d at 289 (quoting *Patten*, 65 S.W. at 419). And its enforcement is entrusted to public officials in the legislative and executive branches: the legislators who must redraw the legislative maps following the census and executive branch officials charged with administering elections. *See* Tenn. Const. art. II, § 4; Tenn. Code Ann. §§ 2-11-201(a)–(b), 2-11-202 (2023). Wygant is suing government officials and asking the judiciary to grant equitable relief against them. Wygant's claim is a quintessential public rights claim that threatens to intrude on the authority of other branches of government. Thus, we may adjudicate that claim only if Wygant satisfies the three-element standing test.

The same goes for Hunt. Hunt alleges that the Senate map violates Article II, Section 3 of the Tennessee Constitution by failing to consecutively number the Senate districts in Davidson County. The right she asserts—the right to have a Senate map drawn in compliance with Article II, Section 3—is common to all Tennesseans, and its enforcement is the responsibility of public officials in the legislative and executive branches. *See* Tenn.

---

[10] As the Georgia Supreme Court recently noted, "[t]he case law and scholarship wrestling with how to define these categories is substantial." *Kennestone Hosp., Inc. v. Emory Univ.*, 897 S.E.2d 772, 779 n.3 (Ga. 2024). Our decision in *Wilmington Trust* suggested at least two possible distinctions between public rights and private rights. The first considers whether the asserted right belongs to society as a whole or instead to a specific individual or group of individuals. *See Wilmington Tr.*, 703 S.W.3d at 284–85; *see also Spokeo*, 578 U.S. at 344 (Thomas, J., concurring); Ann Woodhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 693 (2004). A second considers whether the suit is brought against the government rather than a private party. *See Wilmington Tr.*, 703 S.W.3d at 290–91; *see also Spokeo*, 578 U.S. at 347 (Thomas, J., concurring) ("[W]here one private party has alleged that another private party violated his private rights, there is generally no danger that the private party's suit is an impermissible attempt to police the activity of the political branches."); Thomas P. Schmidt, *Standing Between Private Parties*, 2024 Wis. L. Rev. 1, 7–9 (2024). Another potential distinction turns on the nature of the remedy sought. *See Patten*, 65 S.W. at 421 ("It is a well-settled rule that equity will not interfere by its injunctive process in a case like this unless the complainants show that they will suffer some special injury, and not merely an injury in common with the body of the citizens. This rule is, we believe, without exception."); *see also* Ernest A. Young, *Standing, Equity, and Injury in Fact*, 97 Notre Dame L. Rev. 1885, 1904–10 (2022); Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1776–95 (2022).

Const. art. II, § 4; Tenn. Code Ann. §§ 2-11-201(a)–(b), 2-11-202. Hunt is suing government officials and asking the judiciary to grant equitable relief against them. Like Wygant's claim, Hunt's claim is a textbook public rights claim that threatens to upset the balance of power among the branches. Accordingly, we may not adjudicate that claim unless Hunt satisfies the three-element standing test.

Our three-element standing test from *City of Memphis* requires plaintiffs to show (1) an injury in fact (2) that is fairly traceable to the challenged conduct and (3) is capable of being redressed by a favorable judicial decision. *See* 414 S.W.3d at 98. To satisfy the injury in fact requirement, a plaintiff must show an injury that is "distinct and palpable." *Id.* (quoting *Darnell*, 195 S.W.3d at 620). Injuries that are conjectural, hypothetical, or based on an interest shared by the general public are not enough. *Id.* If the plaintiff is not presently suffering an injury, the injury faced must be "imminent." *Wilmington Tr.*, 703 S.W.3d at 283 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

a. Wygant's Standing to Challenge the House Map

Wygant contends that he has standing to challenge the entire House map, including county splits in districts outside of House District 79 where he resides. The State argues that Wygant has standing to challenge only House District 79. We agree with the State.

According to Wygant, the House map injures him by "denying him the full-county representation the Constitution guarantees." Wygant testified at trial that the Gibson County split "fractured" representation of the county. Because no House member represents the entire county, residents are unsure which representative to contact when an issue arises and often must contact the representatives for both districts that contain a part of Gibson County. In essence, Wygant is alleging that the split of Gibson County reduces the effectiveness of his representation in the House.[11]

---

[11] Wygant also complains that Gibson County is no longer represented by a Gibson County resident. But this injury fails to satisfy the second and third elements of the *City of Memphis* standing test—causation and redressability. Because Gibson County's population is significantly less than the ideal size of a House district, it must be combined with another county to form a district, whether the county is split or not. That means it will always be possible that Gibson County's representative could reside in a different county. The injury Wygant identifies was caused not by the Gibson County split, but by Gibson County's size. A favorable judicial decision in this case would not redress this injury because it would only eliminate the split, not suddenly increase the county's population. Justice Kirby's partial dissent calls this reasoning "corrosive," but it is a straightforward application of the causation and redressability requirements. Moreover, her concern about how this reasoning would apply in racial gerrymandering cases is misplaced: standing in those cases is premised on the stigmatic and representational injuries caused by the racial classifications themselves. *See United States v. Hays*, 515 U.S. 737, 744 (1995).

Whether this injury is sufficiently "distinct and palpable" to constitute an injury in fact for purposes of constitutional standing is a close question. *City of Memphis*, 414 S.W.3d at 98 (quoting *Darnell*, 195 S.W.3d at 620). Our past cases that considered challenges premised on the county-splitting provision did not address whether the plaintiffs had standing. *See Lockert III*, 729 S.W.2d 88; *Lincoln Cnty.*, 701 S.W.2d 602; *Lockert II*, 656 S.W.2d 836; *Lockert I*, 631 S.W.2d 702. Because those cases did not actually discuss standing, they provide no precedential support for Wygant's position. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996) ("[S]tanding was neither challenged nor discussed in that case, and we have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect."); *Univ. of Texas Rio Grande Valley v. Oteka*, 715 S.W.3d 734, 744 (Tex. 2025); *Ward v. Westerfield*, 653 S.W.3d 48, 58 (Ky. 2022).[12]

In the context of racial gerrymandering challenges, the United States Supreme Court has held that the denial of effective representation is a sufficiently concrete injury to support a plaintiff's standing to bring a *district-specific* challenge to a redistricting plan. *See Hays*, 515 U.S. at 739. In *Hays*, the Court explained that racial classifications used in redistricting may cause "representational harms" by causing "elected officials . . . to believe that their primary obligation is to represent only the members of [the favored] group, rather than their constituency as a whole." *Id.* at 744 (quoting *Shaw v. Reno*, 509 U.S. 630, 648 (1993)). A voter residing in the allegedly gerrymandered district has standing to challenge that gerrymander because he has personally suffered those representational harms. *Id.* A voter residing outside that district, by contrast, lacks standing because he "assert[s] only a generalized grievance against governmental conduct of which he or she does not approve." *Id.* at 745; *see also Gill v. Whitford*, 585 U.S. 48, 66 (2018). The harms that underlie a racial gerrymandering claim "directly threaten a voter who lives in the *district* attacked," but "they do not so keenly threaten a voter who lives elsewhere in the State." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015).

This case of course is not a racial gerrymandering case. Still, Wygant's alleged representational injury in some respects resembles the representational harm that was at issue in those cases. The split of Gibson County "fractured" the representation of that county such that it is no longer represented by a single House member. This injury—the denial of a single representative to represent all of Gibson County—is sufficiently "distinct and palpable" to satisfy the injury-in-fact requirement. And Wygant is presently suffering that injury—it occurred as soon as a representative was elected for Wygant's new district.

---

[12] In her separate opinion, Justice Kirby asserts that cases addressing the merits of redistricting claims "implicitly" support standing even if they do not discuss that issue. But "implicit acquiescence" to standing "ha[s] no precedential effect" either. *Trump v. CASA, Inc.*, 606 U.S. 831, 845 n.7 (2025) (alteration in original) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 91 (1998)).

*See Wilmington Tr.*, 703 S.W.3d at 283 (noting that a plaintiff's injury must be "actual or imminent") (quoting *Lujan*, 504 U.S. at 560–61)).

The Texas Supreme Court reached a similar conclusion in *Abbott v. Mexican American Legislative Caucus, Texas House of Representatives*. 647 S.W.3d 681 (Tex. 2022). There, the plaintiff alleged that a redistricting map violated Texas's so-called county line rule in Article III, Section 26 of the Texas Constitution by "providing only one district wholly contained within Cameron County even though the county's population [was] sufficient to support two such districts." *Id.* at 687. The Texas Supreme Court concluded that "Cameron County's residents [were] being deprived of their right . . . to two representatives fully devoted to serving the interests of those residents rather than the residents of both Cameron County and a neighboring county." *Id.* at 693. The court rejected the notion that, because this harm was "shared among county residents," it was a "generalized grievance" that could not confer individual standing. *Id.* To amount to a "generalized grievance," the court explained, the harm must be "not only widely shared, but . . . also of an abstract and indefinite nature." *Id.* (quoting *Fed. Elec. Comm'n v. Akins*, 524 U.S. 11, 23 (1998)). The harm alleged in that case—that Cameron County was deprived of one of the whole representative districts to which it was entitled—was "not abstract but quite specific." *Id.* Here, too, the alleged harm is not abstract but specific: the Gibson County split deprives Wygant of the full-county representation to which he is entitled under Article II, Section 5 of the Tennessee Constitution.[13]

We agree with the State, however, that this harm provides standing only for a *district-specific* challenge, not a challenge to the entire House map. Because Wygant is a resident of Gibson County in House District 79, the split of Gibson County injures him directly. That injury allows him to challenge that split but nothing more. The map's other county splits do not injure Wygant, so he lacks standing to challenge them.

Wygant retorts that he must have standing to challenge the entire House map because it is impossible to evaluate a single county split in isolation or to remedy a split without revisiting the map as a whole. But that argument wrongly conflates injury with remedy. *See Gill*, 585 U.S. at 67–68. The fact that resolving Wygant's claim could require

---

[13] Justice Tarwater's separate opinion contends that *Abbott* is "easily distinguishable" because voters in Cameron County suffered "classic 'representational dilution.'" We struggle to see how the representational injury in *Abbott* was materially different from the injury here. In both cases, a county was divided to form legislative districts, allegedly depriving voters of a representative sufficiently devoted to that county's interests. *See Abbott*, 647 S.W.3d at 693 (explaining that "Cameron County's residents are being deprived of their right . . . to two representatives fully devoted to serving the interests of those residents rather than the residents of both Cameron County and a neighboring county"). Cameron County was split because its population was *too large* to comprise a single district, while Gibson County was split because its population was *too small*. Whatever the reason for the split, the resulting injury was the same.

discussion of other parts of the map or that any remedy may entail redrawing lines in other districts is irrelevant to the standing question. Standing focuses on a plaintiff's *injury*, not the merits of his claim or the scope of the remedy. *See Metro. Gov't of Nash. & Davidson Cnty. v. Tenn. Dep't of Educ.*, 645 S.W.3d 141, 148–50 (Tenn. 2022) (noting that standing does not depend on the merits of a plaintiff's claim); *Gill*, 585 U.S. at 68. As explained, Wygant's harm flows exclusively from the Gibson County split in House District 79. His standing must be limited accordingly.

Wygant's district-specific challenge also satisfies the second and third elements of the *City of Memphis* standing test. His injury—the denial of full-county representation—is fairly traceable to the Gibson County split and would be redressed by a favorable decision here requiring elimination of the split.

### b. Hunt's Standing to Challenge the Senate Map

Hunt advances two slightly different theories for why she has standing to challenge the Senate map. In her briefs, she asserted that the misnumbered district in Davidson County injures her by "diluting the political weight of [her] vote as compared to the votes of the citizens of the State's other populous counties." At oral argument, she framed her injury as the loss of a staggered-term representative. Whether framed as vote dilution or the loss of a staggered-term representative, Hunt's purported injury is not the kind of "distinct and palpable" injury necessary to establish standing.

Take her vote dilution theory. It is well settled that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. Vote dilution can occur when an apportionment scheme violates the one-person, one-vote principle—that is, "the idea that each vote must carry equal weight." *Rucho v. Common Cause*, 588 U.S. 684, 709 (2019). In *Baker v. Carr*, for example, the United States Supreme Court held that Tennessee voters in urban counties had standing to challenge an apportionment scheme that allocated Senators and Representatives arbitrarily rather than based on population. 369 U.S. at 207–08. The Court reasoned that the scheme "effect[ed] a gross disproportion of representation to voting population," which "disfavor[ed]" voters in the urban counties where the plaintiffs resided. *Id.* at 207. Vote dilution also occurs when a legislative district is gerrymandered in a way that reduces a minority group's ability to elect their preferred candidate—for instance, when a district is "cracked" so that there are too few minority voters or "packed" so that minority votes are wasted. *See, e.g.*, *Gill*, 585 U.S. at 66; *Voinovich*, 507 U.S. at 153.

Although Hunt describes her injury as vote dilution, it is in fact nothing of the sort. The misnumbering of Davidson County's Senate districts does not implicate the one-

person, one-vote principle, which requires that representatives be allocated proportionate to population. Nor does it involve gerrymandering that would dilute the voting strength of an identifiable minority group. At bottom, Hunt's complaint is simply that she lives in a non-consecutively numbered Senate district, while other Tennessee voters do not. But that difference does not affect the *weight* or *strength* of her vote, so it is not vote dilution.

Framing the injury instead as the denial of the right to vote for a staggered-term representative does not help Hunt. To be sure, the consecutive numbering requirement of Article II, Section 3 of the Tennessee Constitution is designed to promote political stability by preventing all the Senate positions in a particular county from turning over at the same time. But even assuming that experiencing greater-than-usual turnover would constitute the sort of "distinct and palpable" injury that suffices to establish standing, *City of Memphis*, 414 S.W.3d at 98 (quoting *Darnell*, 195 S.W.3d at 620), Hunt has not shown that this injury is "actual or imminent" in this case, *Wilmington Tr.*, 703 S.W.3d at 283 (quoting *Lujan*, 504 U.S. at 560–61). To the contrary, the record here shows that only one of the three Davidson County Senate seats up for election in 2022 turned over. At best, Hunt has established a mere possibility that this sort of harm could occur in the future. But our precedents make clear that "conjectural" or "hypothetical" injuries are insufficient to establish standing. *City of Memphis*, 414 S.W.3d at 98.

Other courts have allowed voters to challenge the misnumbering of a legislative district when it caused a voter to wait longer than usual to vote. *See, e.g.*, *State ex rel. Steinke v. Lautenbaugh*, 642 N.W.2d 132, 138 (Neb. 2002) (concluding that voter had standing to challenge renumbering of legislative districts where his vote was delayed). But Hunt did not experience any delay here. The new map moved Hunt from District 18, which voted for state senators in presidential election years, to District 17, which voted for state senators in gubernatorial election years. Hunt thus had the opportunity to vote for a senate candidate in 2020 and again in 2022. Her opportunity to vote was accelerated, not delayed.[14]

In sum, Hunt has failed to prove that the misnumbering of Davidson County's Senate district caused her any "distinct and palpable" harm. Because she lacks standing to challenge the Senate map, her claim is not justiciable and must be dismissed.

In her separate opinion, Justice Kirby disagrees with our conclusion that Hunt lacks standing. In her view, a voter *always* has standing to challenge the constitutionality of the

---

[14] We cite *Steinke* only as an example of a situation where standing might exist, not to prove that standing is lacking here. We therefore see no need to respond to Justice Kirby's inapt logical syllogisms about the weather.

voter's own voting district, regardless of the nature of the voter's claim or alleged injury. Respectfully, that approach would eviscerate the injury-in-fact requirement that applies in public-rights cases under *Wilmington Trust*. Perhaps that is why Justice Kirby makes no real attempt to reconcile her position with that precedent.

Rather than evaluate Hunt's standing under *Wilmington Trust* and other controlling precedents, Justice Kirby surveys redistricting cases from other jurisdictions and concludes that allowing voters to challenge the constitutionality of their own voting districts is "the norm in state redistricting jurisprudence." As the partial dissent acknowledges, however, some States have expressly granted voters standing by constitutional provision or statute. And many redistricting cases addressed voters' claims on the merits without first considering whether they had standing.[15] This is hardly a situation where we should follow the national "norm" rather than adhere to our Tennessee-specific standing framework.

The partial dissent's fleeting argument that Hunt satisfies Tennessee's actual standing framework fares no better. Justice Kirby maintains that Hunt suffered a concrete injury because "[t]he redistricted map places [her] in a different Senate district with a new senator whom she perceives as not connected to her county." Yet even if that injury is sufficiently distinct and palpable, it fails the causation and traceability elements of our standing test because it has nothing to do with the *consecutive numbering* violation that Hunt alleges. Recall that, to establish standing, a plaintiff must establish a "causal connection between the claimed injury and the *challenged conduct*" and show that "the alleged injury is capable of being redressed by a favorable decision of the court." *Darnell*, 195 S.W.3d at 620 (emphasis added). Hunt's placement in a different Senate district, represented by a different Senator, stems not from the misnumbering of her district but from the larger redistricting process. Accordingly, a judgment in Hunt's favor on her consecutive-numbering claim would not redress that injury; it would merely require that her new district be renumbered, not that she be returned to her old Senate district.[16]

The partial dissent's attempt to equate Hunt's injury with Wygant's representational harm also fails. Wygant's representational harm was sufficient to establish standing because he suffered a concrete injury when Gibson County was split and he was placed in

---

[15] As explained above, cases in which "standing was neither challenged nor discussed" provide no support for the partial dissent's position that voters always have standing to challenge the constitutionality of their own district. *Lewis*, 518 U.S. at 352 n.2.

[16] In *Pereira v. Town of North Hempstead*, 682 F. Supp. 3d 234, 240 (E.D.N.Y. 2023), the plaintiff alleged that the town violated the federal Constitution by arbitrarily swapping the numbers of two districts. There was no dispute there that the causation and redressability elements of the standing test were satisfied, because "the prior District lines would be restored" if the plaintiff prevailed. *Id.* at 241 n.6. That easily distinguishes *Pereira* from this case.

-30-

a fractured House district containing only part of Gibson County. He experienced not only the legal injury of residing in an unconstitutional House district, but also the resulting denial of effective representation. Hunt experienced only the *legal* injury of residing in a misnumbered Senate district. She did not suffer any concrete factual injury from that constitutional violation.

Justice Kirby maintains that, even if Hunt did not suffer concrete harm in the most recent election, Hunt faces imminent injury in future elections because "we know for sure that turnover in representation for District 17 and Davidson County" will occur "[o]ne way or another" when the legislator eventually retires, resigns, gets voted out, or passes away. That reasoning misunderstands the imminence requirement. An injury is imminent if it is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). That means that the injury must be "likely to occur soon," not just that it will happen at some unknown future time. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). And plaintiffs cannot rely on "statistical probability" alone to make that showing; rather, they must set forth "specific facts" and "concrete details" to prove that injury is sufficiently likely in the near future. *Tenn. Conf. of NAACP v. Lee*, 139 F.4th 557, 567–68 (6th Cir. 2025). Hunt failed to make that showing here.

Our conclusion that Hunt lacks standing to challenge the misnumbering of Senate District 17 does not mean that violations of Article II, Section 3 of the Tennessee Constitution are immune from judicial review. Other plaintiffs—whether voters, candidates, or public officials—may be able to establish standing based on different facts in future cases.[17] We hold only that Hunt lacks standing based on the record before us.

### B. Wygant's District Specific Challenge to the House Map

Before we evaluate the constitutionality of the Gibson County split in the House plan, we must resolve a dispute between the parties regarding the legal standard and burden of proof. We address that issue first and then turn to the merits of Wygant's challenge.

### *1. Legal Standard*

Wygant contends that our decision in *Lockert I* requires us to apply a burden-shifting standard. The plaintiff has the burden to show that the challenged map divides a county. The burden then shifts to the defendant to prove that the legislature made an honest and

---

[17] Regardless, the concern that no one will have standing to bring a claim "is not a reason to find standing." *All. for Hippocratic Med.*, 602 U.S. at 396 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)) (explaining that "some issues may be left to the political and democratic processes").

good-faith effort to cross as few lines as necessary to comply with federal law. If that burden is met, then, under *Lincoln County*, the plaintiff must prove bad faith or improper motive. The State contends that *Lincoln County*—not *Lockert I*—governs this district-specific challenge and requires the plaintiff to prove that the defendant acted in bad faith or with an improper motive. According to the State, requiring the defendant to prove good faith would conflict with the presumption of constitutionality that attaches to all legislative action.

We begin by revisiting our previous decisions involving county-splitting challenges to reapportionment statutes. The plaintiffs in *Lockert I* challenged the Senate Reapportionment Act of 1981 on the ground that it crossed county lines in violation of Article II, Section 6 of the Tennessee Constitution. 631 S.W.2d at 704. We acknowledged in that case that, "[i]f there is an unavoidable conflict between federal and state requirements . . . the state requirements become secondary to the necessity of complying with the equal protection clause." *Id.* at 708–09. But we instructed that "[t]he prohibition against crossing county lines should be complied with insofar as is possible under equal protection requirements." *Id.* at 709. Although "a state constitutional provision may be violated to an extent" to satisfy federal requirements, it "still must be given due consideration and all possible effect." *Id.* at 710.

Because the plaintiffs had "show[n] that the Act violates the state's constitutional prohibitions against crossing county lines," the "burden [then] shifted to the defendants to show that the Legislature was justified in passing a reapportionment act which crossed county lines." *Id.* at 714. We held that material questions of fact remained regarding whether "the state made an honest and good faith effort to construct senatorial districts which comply with both federal and state constitutions." *Id.* We therefore reversed the trial court's grant of summary judgment for the plaintiffs and remanded for further proceedings. *Id.*

The following year, in *Lockert II*, we considered county-splitting challenges to a revised Senate reapportionment plan that was passed in 1982 and to the House Reapportionment Act of 1981. The defendants in that case urged us to "reconsider our holding" in *Lockert I* "that the State's constitutional prohibition against crossing county lines must be enforced insofar as is possible and that any apportionment plan adopted must cross as few county lines as is necessary to comply with federal constitutional requirements." 656 S.W.2d at 838. We declined to do so. Moreover, we were "not persuaded by . . . defendants' arguments that we should sanction a single county line violation not shown to be necessary to avoid a breach of federal constitutional requirements." *Id.* at 839.

-32-

With respect to the Senate map, we held that the split of Washington County was unconstitutional because it was done solely to avoid having two incumbents in the same district, not to reduce the map's population variance. *Id.* We also concluded that splits in Knox, Davidson, and Shelby Counties could be reduced without risking noncompliance with federal requirements. *Id.* at 839–41. We faulted the legislature for seeking to "achiev[e] near perfection in responding to the one person, one vote federal mandate," explaining that "a constitutionally backed state policy of preserving county boundaries will clearly be given high priority in the table of legitimate state policy considerations to justify variances from the ideal." *Id.* at 840. The House map, which split fifty-seven counties, suffered from the same flaw. The Court found that it "was drafted with the objective of achieving a very low percentage of total deviation" and that "virtually no effort was made to comply" with Article II, Section 5. *Id.* at 842. We affirmed the trial court's holdings finding the Senate and House plans unconstitutional but made "slight modifications" to the specific limitations the trial court had imposed when providing instructions for remedial maps. Because the record in that case showed that it would be difficult to keep the total population variance below 10%, we raised the variance limit from 10% to 14%. *Id.* at 844. And although the trial court had imposed an upper limit of twenty-five county splits for the House plan, we thought a limit of thirty counties was more appropriate. *Id.* But we added two caveats to that limit: no single county could be divided more than once, and the four urban counties could not be divided unless necessary to reduce a variance in an adjoining district or to prevent minority vote dilution. *Id.*

Two years later, in *Lincoln County*, we considered a county-splitting challenge to the House Reapportionment Act of 1984, which was passed in response to *Lockert II*. Unlike *Lockert I* and *Lockert II*, which involved statewide challenges, the challenge in *Lincoln County* "attacked only the division of Marshall County and sought a different division of Lincoln County." 701 S.W.2d at 603. There was "no question" in that case that the reapportionment statute complied with the limits articulated in *Lockert II*. *Id.* Moreover, a three-judge federal court had already held that the statute satisfied federal constitutional requirements. *Id.* at 602–03. Neither the plaintiffs nor the defendants "offered any testimony at trial" in the state action. *Id.* Instead, they presented the case "on a stipulation of facts," with each side "insist[ing] that the other had the burden of proof." *Id.* at 603.

We reversed the trial court's judgment that held the Lincoln County split unconstitutional. *Id.* at 604. We deemed the proof "insufficient" to support that holding, noting that the plaintiffs "ha[d] offered no evidence to demonstrate bad faith by the General Assembly or to establish deliberate gerrymandering." *Id.* at 603. Taken together, the federal court's holding that the House plan satisfied federal requirements and the parties' agreement that the plan satisfied *Lockert II* persuaded us "that it would be improper to set aside individual district lines on the ground that they theoretically might have been drawn more perfectly, in the absence of any proof whatever of bad faith or improper motives." *Id.*

-33-

at 604. We cautioned that "to permit separate, minute piecemeal attacks" on a reapportionment plan "would involve both the courts and the General Assembly in needless and protracted litigation over a subject for which the General Assembly has principal responsibility and in which it has primary authority." *Id.*

Two years after that, in *Lockert III*—otherwise known as "chapter three in the tortured history of the intractable reapportionment problem"—we considered a claim alleging that the Senate Reapportionment Act of 1984 was unconstitutional because it split Shelby County. 729 S.W.2d at 89. Although the plaintiffs had argued that the county was split to "serve the interests of incumbents," they presented no proof on that issue. *Id.* at 90. The defendants, on the other hand, presented testimony that if a portion of Shelby County were not combined with Tipton and Lauderdale Counties, the map for all of West Tennessee and some of Middle Tennessee would have to be redrawn, potentially affecting a majority-minority district in Davidson County. *Id.* Based on that evidence, we affirmed the trial court's finding that the legislature "had acted in good faith in its efforts to comply with both federal and state constitutions" in enacting the 1984 Senate plan. *Id.*

It is understandable that the trial court panel was unsure what legal standard and burden of proof to apply to Wygant's claim. We made no attempt in *Lincoln County* to reconcile the bad-faith standard we applied there with the burden-shifting approach we applied in *Lockert I*. Nevertheless, three clear principles emerge from our precedents that must inform our consideration of the appropriate legal standard.

*First*, the provisions of the Tennessee Constitution that prohibit the General Assembly from dividing counties when apportioning the number of representatives and senators into multi-county districts—Sections 5 and 6 of Article II, respectively—must be enforced to the extent they are not preempted by conflicting federal constitutional or statutory requirements. As we put it in *Lockert I*, "where necessary to meet federal constitutional requirements, a state constitutional provision may be violated to an extent, but still must be given due consideration and all possible effect." 631 S.W.2d at 710; *see also id.* at 715 ("[T]he plan adopted must cross as few county lines as is necessary to comply with the federal constitutional requirements."). This principle is consistent with federal preemption doctrine: when a federal law preempts state law because of a conflict between the two, "state law is displaced only 'to the extent that it actually conflicts with federal law.'" *Dalton v. Little Rock Fam. Plan. Servs.*, 516 U.S. 474, 476 (1996) (quoting *Pacific Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 204 (1983)).

*Second*, notwithstanding its obligation to comply with the Tennessee Constitution, the State must be afforded discretion in determining how best to thread the needle between conflicting federal and state requirements. The mere fact that district lines "theoretically

might have been drawn more perfectly" will not justify "set[ting] aside individual district lines." *Lincoln Cnty.*, 701 S.W.2d at 604; *see also Moore v. State*, 436 S.W.3d 775, 788 (Tenn. Ct. App. 2014) ("A redistricting plan will not be set aside on constitutional grounds merely because a slightly 'better' plan can be devised . . . ."). Our Constitution gives the legislature "principal responsibility" and "primary authority" for redistricting. *Lincoln Cnty.*, 701 S.W.2d at 604; *see also* Tenn. Const. art. II, § 4. The legislature's exercise of that authority is not wholly immune from judicial oversight, but the judiciary should not micromanage the legislature or be too quick to second-guess the legislature's decisions in this exceedingly complex process. *See Miller v. Johnson*, 515 U.S. 900, 915–16 (1995) (acknowledging that "[e]lectoral districting is a most difficult subject for legislatures" and admonishing courts to be "sensitive to the complex interplay of forces that enter a legislature's redistricting calculus").

*Third*, courts must "presume that acts of the legislature are constitutional" and "'indulge every doubt in favor of constitutionality.'" *Gilliam v. Gerragano*, --- S.W.3d ---, 2025 WL 617603, *4 (Tenn. Feb. 26, 2025) (first citing *Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003); and then quoting *Lynch*, 205 S.W.3d at 390); *see also Fisher v. Hargett*, 604 S.W.3d 381, 397 (Tenn. 2020); *Willeford v. Klepper*, 597 S.W.3d 454, 465 (Tenn. 2020). It is well settled that the party challenging the constitutionality of a statute "bears [the] heavy burden of overcoming that presumption." *Helms v. Tenn. Dep't of Safety*, 987 S.W.2d 545, 550 (Tenn. 1999); *Gallaher*, 104 S.W.3d at 460.

Given this presumption of constitutionality, we must reject Wygant's proposed burden-shifting standard, which would require the State to prove that it made an honest and good-faith effort to enact a redistricting plan that crosses as few lines as necessary. The presumption of constitutionality requires that the burden of proof in a redistricting challenge—whether statewide or district-specific—remains at all times on the party challenging the statute. We therefore overrule *Lockert I* to the extent it adopted such a burden-shifting approach.

So what exactly must Wygant show to establish the unconstitutionality of the Gibson County split? Because federal law preempts the Tennessee Constitution's county-splitting provisions in part, it is not enough to simply show that a reapportionment plan divides counties. The county-splitting provisions "may be violated" to the extent necessary to meet federal constitutional requirements. *Lockert I*, 631 S.W.2d at 710. That means a plaintiff must, at a minimum, present evidence that the challenged split or splits were not necessary to comply with federal law. Ordinarily, a plaintiff will meet this burden by presenting an alternative map that divides fewer counties and satisfies federal requirements. In a district-specific challenge, the alternative map should split fewer counties total and eliminate the specific splits being challenged.

But because we must give the legislature leeway to carry out its reapportionment responsibilities without constant judicial second-guessing, proof that a map "might have been drawn more perfectly" will not by itself establish a constitutional violation. *Moore*, 436 S.W.3d at 788. The plaintiff's ultimate burden "is not to establish that some other preferable plan exists, but to demonstrate the absence of a rational or legitimate basis for the challenged plan's failure to satisfy" state constitutional requirements. *In re Reapportionment of Towns of Hartland, Windsor, & W. Windsor*, 624 A.2d 323, 327 (Vt. 1993). If the legislature's reconciliation of conflicting federal and state requirements "is fairly debatable and not clearly erroneous, arbitrary, or wholly unwarranted," the legislature's plan must be upheld. *Wilkins v. West*, 571 S.E.2d 100, 108 (Va. 2002).

Our past redistricting decisions framed the inquiry as whether the legislature made "an honest and good faith effort" to split as few lines as necessary, *Lockert I*, 631 S.W.2d at 714, or instead acted with "bad faith or improper motive," *Lincoln Cnty.*, 701 S.W.2d at 604. We overrule those precedents to the extent they require courts to assess the subjective motivations of the legislature in a county-splitting challenge. Determining whether a collective body such as the legislature acted in good faith is difficult in any circumstance, but it is especially challenging in the redistricting context, where the legislature's decisions are often based on a host of competing considerations.[18]

To sum up: a plaintiff challenging a state reapportionment statute based on the county-splitting provisions in Sections 5 and 6 of Article II of the Tennessee Constitution bears the burden of proving that the challenged split or splits were unnecessary to satisfy federal requirements. If that burden is met, the plaintiff must also prove that the legislature's decision to split the county was not rationally or legitimately related to achieving compliance with federal law.

### 2. Constitutionality of the Gibson County Split

The trial court panel held that Wygant's challenge to the Gibson County split under Article II, Section 5 of the Tennessee Constitution failed. Applying the standard explained above, we reach the same conclusion.

---

[18] This holding does not foreclose Tennessee's courts from examining good faith in other redistricting challenges based on the federal Equal Protection Clause. *See Abbott v. Perez*, 585 U.S. 579, 603 (2018) (explaining that a plaintiff bringing a racial gerrymandering claim must overcome the presumption of good faith by proving discriminatory intent); *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 258 (2016) ("The Fourteenth Amendment's Equal Protection Clause requires States to 'make an honest and good faith effort to construct [legislative] districts . . . as nearly of equal population as is practicable.'" (alteration in original) (quoting *Reynolds*, 377 U.S. at 577)).

It is undisputed that the House map divided Gibson County to form House Districts 79 and 82. At trial, Wygant's expert presented Map 13d_e as evidence that the House map divided more counties than necessary to comply with federal constitutional requirements. Map 13d_e split only twenty-four counties, six fewer than the enacted House map, but it did not split Gibson County. And it achieved a population variance of 9.89%—.01% less than the enacted House map— while maintaining the same number of majority-minority districts. Wygant thus proved that the legislature could have complied with federal law without dividing Gibson County. Notably, however, Wygant's expert did not present Map 13d_e until well after the legislative session ended and more than a year into this litigation, and only after the State's experts identified constitutional problems with earlier alternative maps.

Although Wygant established that the legislature could have drawn a more perfect map, he failed to prove that the State's decision to split Gibson County was not rationally or legitimately related to achieving compliance with federal redistricting requirements. The record here overwhelmingly establishes that the legislature split Gibson County in an effort to comply with the Equal Protection Clause and the VRA.

Tennessee's population grew by nearly 9% between 2010 and 2020, to nearly seven million residents. Each of Tennessee's ninety-nine House districts would need a population of 69,806 to achieve equal population. But the population growth that occurred between 2010 and 2020 was uneven, with suburban counties in Middle Tennessee experiencing double digit growth and many counties in West and East Tennessee losing population. Because of this uneven growth, many existing districts fell above or below the ideal population size. To even things out, the legislature needed to move three House seats from the West and East "toward Middle Tennessee."

Because Gibson County's new population of 50,429 was too small to form a single district, it had to be attached to a neighboring county. The legislature considered leaving Gibson County whole and combining it with a portion of Madison County, to its south, but that option presented VRA concerns. In 1998, a federal court held that a previous House map violated section 2 of the VRA by diluting the votes of minority voters in rural West Tennessee. *See Rural W. Tenn. Afr. Am. Affs. Council, Inc. v. Sundquist*, 29 F. Supp. 2d 448, 462–63 (W.D. Tenn. 1998). Himes testified that Madison County's existing voting districts had been formed in response to that litigation, so adjusting those boundaries would present a risk of new VRA litigation.

The other contiguous counties that could theoretically be combined with Gibson County were Carroll, Crockett, Dyer, Obion, or Weakley Counties. But combining all of Gibson County with the entirety of one of these other counties would not achieve a district with ideal population size. For example, combining Gibson County's population of 50,429

with the least populous of these counties—Crockett County, which has a population of 13,391—would still fall short of the ideal population size. And combining Gibson County with any of the other counties would lead to a district above the ideal population size.[19]

In light of Madison County's VRA concerns and the need to achieve equal population, Himes determined that Gibson County must be combined with another county or counties, and that at least one of those counties would need to be divided. The legislature ultimately decided to divide Gibson County. Although another county conceivably could have been divided instead, the legislature could split Gibson County while keeping most of its municipalities in District 79. This configuration also benefitted Carroll County. Carroll County had been divided in the 2012 plan, and by splitting Gibson County the legislature could maintain the same district boundary within Carroll County.

Faced with the "complex interplay of forces" that must necessarily "enter a legislature's redistricting calculus," *Miller*, 515 U.S. at 915, Tennessee's General Assembly acted rationally in deciding to divide Gibson County. That decision left Madison County's boundaries intact, avoiding additional VRA litigation. And it achieved equal population while keeping most of Gibson County's municipalities in the same district and maintaining Carroll County's existing within-county boundary. These considerations were undoubtedly legitimate.

Wygant points out that Himes repeatedly advised the House Redistricting Committee—incorrectly—that it could divide up to thirty counties under *Lockert II*. To the extent that either Himes or the legislature understood our decision in *Lockert II* as creating a thirty-county safe harbor for county splitting, that understanding was incorrect. The guidelines we provided in *Lockert II* were based on the specific evidence presented in that case, including population figures that are no longer accurate and alternative plans that addressed the unique concerns at issue there. *See Rural W. Tenn. Afr.-Am. Affs. Council, Inc.*, 836 F. Supp. at 450–51 ("[N]owhere in the *Lockert II* opinion does the court purport to establish an absolute numerical standard, applicable in all redistricting contexts."). But that misunderstanding—by itself—does not establish that the legislature lacked a rational or legitimate basis for dividing Gibson County. As explained above, the record proves that the legislature's decision to split the county was based on legitimate considerations.

In sum, Wygant failed to prove that the legislature lacked a rational or legitimate basis for dividing Gibson County. We therefore hold that Wygant's district-specific challenge to the House apportionment statute under Article II, Section 5 of the Tennessee Constitution fails. And we affirm the trial court's judgment with respect to that claim.

---

[19] Carroll County's population was 28,400; Dyer County's population was 36,801; Obion County's population was 30,787; and Weakley County's population was 32,902.

## CONCLUSION

We affirm the trial court's judgment in part and reverse in part. We agree with the trial court's conclusion that Wygant has standing to bring a district-specific challenge to the House reapportionment statute, and we affirm the trial court's judgment dismissing that claim because Wygant failed to prove that the Gibson County split is unconstitutional. We reverse the trial court's holding that Hunt had standing to challenge the Senate reapportionment plan, and we vacate the trial court's judgment to the extent it held that plan unconstitutional. Finally, we remand this case to the trial court for further proceedings consistent with this opinion.

_____
SARAH K. CAMPBELL, JUSTICE